# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL SAUNDERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 12 C 9158** |
| | ) | |
| **v.** | ) | **Judge Robert M. Dow, Jr.** |
| | ) | **Magistrate Judge Finnegan** |
| **CITY OF CHICAGO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

| | | |
|---|---|---|
| **VINCENT THAMES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 12 C 9170** |
| | ) | |
| **v.** | ) | **Judge Robert M. Dow, Jr.** |
| | ) | **Magistrate Judge Finnegan** |
| **CITY OF CHICAGO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

| | | |
|---|---|---|
| **HAROLD RICHARDSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 12 C 9184** |
| | ) | |
| **v.** | ) | **Judge Robert M. Dow, Jr.** |
| | ) | **Magistrate Judge Finnegan** |
| **CITY OF CHICAGO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Michael Saunders, Vincent Thames and Harold Richardson allege that they were wrongfully convicted and imprisoned for the 1994 rape and murder of Nina Glover. After serving more than 16 years in prison, Plaintiffs asked the Cook County State's Attorney's Office ("SAO") to conduct a reinvestigation in August 2010, and it did

so. Based on the results of some new DNA evidence, Plaintiffs moved the state court to vacate their convictions, and the motion was granted over the SAO's objection in November 2011. Some weeks later, in January 2012, the SAO announced that it was dismissing all the criminal charges. After this, Plaintiffs petitioned for Certificates of Innocence which were granted in September 2012 over the SAO's objection. These civil rights lawsuits followed in November 2012.

All Plaintiffs have separately sued the City of Chicago and eight current and former Chicago Police Officers ("Defendant Officers"). Plaintiffs Saunders and Thames also have sued former Assistant State's Attorney ("ASA") Terrence Johnson and Cook County. Plaintiff Saunders alone has sued current ASA Fabio Valentini and Chicago Police Department Youth Officer Charles Bowen. The claims arise under 42 U.S.C. § 1983 for violations of constitutional rights, and under state law based on malicious prosecution, intentional infliction of emotional distress, civil conspiracy, and respondeat superior and indemnification (against Cook County). There is a *Monell* claim against the City of Chicago.[1]

Now before the Court is Plaintiffs' motion to compel the SAO's reinvestigation documents that were subpoenaed but withheld under the deliberative process privilege and attorney work product doctrine. Plaintiffs also seek to compel Valentini to produce documents and respond to questions posed during his deposition that he declined to answer based on the deliberative process privilege. For the reasons discussed below, the motion to compel is granted in part and denied in part. The SAO improperly attempts to place a cloak over every piece of paper generated or reviewed during the

---

[1] For reasons of judicial efficiency, Judge Dow has been assigned to preside over pretrial proceedings in all three cases, and this Court is the designated magistrate judge responsible for discovery supervision.

reinvestigation, even documents that convey only factual information and reveal no deliberations. Plaintiffs, on the other hand, seek production not only of factual information, but also evidence of the SAO's actual deliberations. They argue that they need to know, for example, why the SAO opposed vacating the convictions and what role Valentini (by then the Chief of the Criminal Prosecutions Bureau) played in the decision. This Court is not persuaded by either side's position.

**BACKGROUND**[2]

Given Plaintiffs' assertion that the deliberations it seeks to compel from 2011 and 2012 bear on whether Valentini fabricated Saunders' "confession" in 1995, this opinion begins with a summary of the underlying events before turning to the privilege issues.

**A.    The Alleged Confessions**

According to Plaintiffs' allegations in the lawsuits, the "confessions" to the 1994 rape and murder of Nina Glover were obtained in the following manner. With the investigation at a standstill, Defendant Officers first arrested eighteen-year-old Jerry Fincher and interrogated him about the murder for two days. By threatening Fincher with violence and feeding him details of the crime, Defendant Officers unlawfully coerced Fincher into giving a false statement to then ASA Johnson, who was assigned to felony review along with ASA Valentini. ASA Johnson participated with the Defendant Officers in the interrogation of Fincher and reduced his statement to writing. Fincher's coerced confession falsely implicated himself and four other neighborhood teenagers: the three Plaintiffs and Terrill Swift, who has filed a lawsuit in state court.

---

[2]  For ease of reference, unless otherwise noted, all record citations are drawn from the docket in Case No. 12 C 9158. Page numbers are drawn from the CM/ECF docket entries at the top of the filed document.

On March 9, 1995, Defendant Officers arrested, interrogated, and improperly coerced then eighteen-year-old Thames into giving a false confession in a recorded statement. ASA Johnson participated in Thames' interrogation, coordinated with Defendant Officers to ensure that those involved in the interrogation of Thames were apprised of the details stemming from the interrogation of Fincher, and drafted two confession statements that Thames ultimately signed.

That same day, Defendant Officers separately arrested and interrogated then sixteen-year-old Richardson, as well as Terrill Swift. They improperly coerced Swift to confess and falsely implicate Saunders, Thames, and Richardson. In addition, after hours of improper coercion and false promises of leniency, Defendant Officers secured a false oral confession from Richardson, which implicated Saunders and Thames. While Richardson's complaint does not contain any allegations regarding the involvement of ASAs Johnson and Valentini (Richardson has not sued either individual), Saunders' complaint does. It alleges that Richardson never gave a statement to ASA Johnson yet Johnson later falsely claimed that Richardson had confessed to him. It further alleges that Richardson eventually succumbed to unlawful pressure by giving an oral admission to ASA Valentini but, knowing it was false, refused to allow the statement to be reduced to writing. (Doc. 1, Cmplt. ¶ 68).

The last of the teens to be arrested and interrogated was then fifteen-year-old Michael Saunders. Defendant Officers tried to coerce him into giving a false confession by force and threats. "Despite this pressure, Michael did not initially acquiesce. ASA Fabio Valentini, who had been working with ASA Johnson and the Defendant Officers, fabricated a written statement attributed to Michael Saunders implicating Michael and

the other four teenagers in the rape and murder of Ms. Glover.  Under pressure from Defendants, Michael signed this statement without reading it and initialed 'corrections' which Defendants falsely represented had originated with Michael." (*Id.* ¶ 55).

While the above allegations in the lawsuit filed in November 2012 clearly accuse Valentini of fabricating Saunders' statement, Valentini and the SAO say this was not alleged when the reinvestigation and deliberations were ongoing.  Instead, it appeared that Saunders was alleging misconduct only by the police for coercing a false confession.  By way of rebuttal, Saunders' counsel has supplemented the motion to compel with a copy of Saunders' testimony from his suppression hearing in 1997, the letter from the Innocence Project to the SAO on August 10, 2010 asking for DNA testing, and Plaintiff's July 25, 2011 amended motion to vacate the convictions.  (Doc. 176).  These documents are examined below.

**B.  Saunders' Motion to Suppress his Confession**

The first and apparently only time Saunders testified about the circumstances surrounding his "confession" (at least prior to his deposition in this civil case) was during a suppression hearing in the criminal case on September 17, 1997.  (Doc. 176).  He was not asked on direct examination about the eight-page statement he signed that had been handwritten by Valentini.  Instead, he testified about what happened (or did not happen) prior to his signing the statement: the abuse and threats of the police officers, the officers' failure to advise him of his rights, and their refusal to act on his requests for a lawyer and to call his mother.

On cross-examination Saunders was asked whether "[a]t about 7:00 in the evening you were introduced to a man by the name of Fabio Valentini, a State's

Attorney."  He responded "I can't recall what time it was."  (Doc. 176-1, at 27-28).

Saunders was next asked: "Do you recall that name?  When I said that name do you

know who I'm talking about?"  Saunders answered "I would know him if you show him to

me."  (*Id.* at 28).  He was then asked if "you remember him being a white guy?" and

Saunders responded "yes."  (*Id.*).  Next he was asked: "Do you remember him being

about twenty-five, twenty-six years old…possibly late twenties" and Saunders said

"probably like early thirties or early forties, somewhere in there."  (*Id.*).

Saunders was asked if he recalled "a guy talking to you who said the words I am

an Assistant State's Attorney.  I'm not your lawyer, I'm a prosecutor[.]"  Saunders

responded "No sir."  (*Id.*).  He gave the same answer to the next question:  "Did you

ever talk to an Assistant State's Attorney, a person that told you they were an Assistant

State's Attorney?"  (*Id.*).  At this point, questions were asked about the handwritten

statement in the following exchange:

> Q: Well, this handwritten confession that you gave, there is a name on
> there Fabio Valentini.  Do you know who that person is?
> A:  No, sir.
>
> Q: Did anyone that night ever come in and tell you, any white guy in his
> twenties or early thirties, come in and say to you I am an Assistant State's
> Attorney?
> A:  No, sir.
>
> Q:  Anybody come in and say I'm a lawyer and prosecutor?
> A:  No, sir.
>
> Q: Is it your testimony today that the only people that you talked to was
> this detective, this first one here?
> A:  And two other ones.
>
> Q:  And the second one that you have described as a male white, fifties,
> with gray hair?
> A:  Yes, sir.

Q: Now, describe the third one.
A: He was about five-six, somewhere around there, probably in his late forties somewhere, blond hair and he was wearing a regular suit just like everybody else.

Q: Well, describe the people that were in when you gave this confession. Tell us what the individuals looked like who were in the room with you when you gave this?
A: The officer that was testifying this morning.

Q: That's one.
A: The officer who I described, the one with the, like in his early fifties, somewhere around there, him, and the guy with the blond hair, the white guy with the blond hair.

Q: Those were the only people?
A: Yes, sir.

[Saunders is then shown the eight-page handwritten statement]

Q: Those people that you describe, those are the ones that were with you when this was written out?
A: Yes, sir.

Q: Okay. Youth Officer Bowen, was he there when this was given.
A: No, sir.

*       *       *       *

Q: So then is it your testimony that after the threats that's when you told them what's on these eight pages?
A: They had woke me up early in the morning, about 3:00 or 4:00 in the morning and they tell me put your name right here. And me not knowing, I had just woke up, I had just put my name right there. And after I put my name right there, that's when he got to reading it out.

Q: And they only asked you to put your name down once?
A: No, all the sheets of the paper.

Q: So, you signed all the sheets of the paper?
A: Yes, sir.

(Doc. 176-1, at 29-33).

Valentini was called as a rebuttal witness at the hearing. According to the appellate court's opinion, Valentini spoke with Saunders and then wrote out the statement. He read each page of the statement out loud to Saunders who made and initialed corrections before signing each page. *People v. Saunders*, 307 Ill. App. 3d 406, 718 N.E.2d 531 (1st Dist. 1999).[3]

## C.    Trial and Sentencing

Saunders and Richardson were convicted after bench trials in November 1997. Valentini testified at the trial of Saunders. Saunders did not. Based on an abstract of the trial prepared during the reinvestigation (CCSAO 08623), the defense closing argument noted that the only evidence against Saunders was the handwritten statement, and that his mother was not present when it was taken or during the interview process. Defense counsel argued that this made the statement unreliable even though a youth officer was there. Defense counsel also noted that Saunders was

---

[3]    The full summary of Valentini's testimony follows:

Assistant State's Attorney Fabio Valentini testified that at 7 p.m. on March 11, 1995, he advised defendant of his Miranda rights and defendant stated he understood each of them. Valentini also explained that even though defendant was a juvenile, because of the charges, he would be tried and sentenced as if he were an adult. Defendant stated that he understood and agreed to answer questions. After a 30-minute conversation, Valentini explained the ways in which defendant's statement could be memorialized. Defendant said he wanted a handwritten statement. Before writing the statement, Valentini and the youth officer were alone with defendant, and Valentini asked him how he had been treated by the police. Defendant responded, "very good." Defendant did not state that the police slapped him or pulled his earring, and Valentini did not notice any injuries. Valentini began writing defendant's statement at 8:20 p.m. After he completed defendant's statement, he asked defendant to read aloud the preprinted portion regarding his rights and the additional juvenile warnings that Valentini had written out. Defendant read and stated he understood his rights and then signed immediately below. With defendant sitting beside him, Valentini read the remaining statement aloud. Defendant made several corrections, initialed them, and signed each page after verifying its correctness. Valentini testified on cross-examination that he did not try to contact defendant's mother or ask if defendant wanted to have her present. Valentini did not ask defendant to repeat his rights in his own words because defendant spoke intelligently and seemed to understand what Valentini said.

*Id.* at 410, 718 N.E.2d at 534. The appellate court affirmed the conviction, rejecting Saunders' argument that collateral estoppel barred the trial court from reconsidering and then reversing its original ruling to suppress the statement as involuntary. *Id.* at 412, 718 N.E.2d at 535.

the last to get arrested and the police knew all of the evidence that eventually made its way into his statement.  Since the DNA evidence excluded Saunders, counsel argued that the contents of the handwritten statement did not suffice to establish Saunders' guilt.  No accusations appear to have been made during the trial that Valentini fabricated the confession.

While the presiding judge found Saunders guilty, he also said the whole case came down to the confession and that without it, there was no case.  (Doc. 176-3, at 11).  Saunders and Richardson were each sentenced to 40 years in prison.  Later, Thames opted to plead guilty and was sentenced to 30 years in prison.  (Doc. 176-2, at 6).

### D.     Convictions Vacated Based on DNA Evidence

**1.  Letter to ASA Ertler:**  On August 10, 2010, a staff attorney with the Innocence Project, Craig McCooley, sent a letter to ASA Mark Ertler in the DNA Review Unit within the Criminal Prosecutions Bureau of the SAO.  (Doc. 176-3).  In the letter, Mr. McCooley said he was representing Saunders and requested assistance and support in post-conviction DNA testing.  He wrote that the only evidence supporting the conviction was the "March 11, 1995 handwritten statement, written by Assistant State's Attorney Fabio Valentini, in which Saunders discusses his alleged involvement in Glover's rape-murder."  (*Id.* at 3).  The letter continued: "Saunders claims his statement is untrue and he signed it out of fear after being told things would be better for him if he did so."  (*Id.*). The letter also challenged the convictions of the other teens, stating "[t]he same can be said for Richardson's, Thames's, and Swift's convictions—they're all premised, solely, on statements that they have disavowed."  (*Id.*).  The letter then provided more specific

information about the circumstances surrounding the statement signed by Saunders, as follows:

> On March 11, 1995, Detectives Paladino and Bowen and Assistant State's Attorney Fabio Valentini interviewed Saunders.[21] [n.21: Saunders's oral statement, which ASA Terence Johnson hand wrote, is attached hereto as Exhibit 8.] Saunders gave an oral statement implicating himself, Richardson (MoMike), Swift (Pud), and Thames (Vincent Thames) in Glover's murder. Assistant State's Attorney Valentini memorialized Saunders's statement on March 11, 1995 at 8:20 p.m.[22] [n.22: *Id.*]
>
> \* \* \* \* \*
>
> After their arrests, Saunders and his co-defendants immediately claimed their innocence and alleged that their statements were involuntary and untrue.

(*Id.* at 9-10).

In arguing to ASA Ertler that there were reasons to doubt the validity of Saunders' confession, Mr. McCooley noted that Saunders and the others were only teenagers when they were interrogated and "juveniles are more susceptible to false confessions." (*Id.* at 13). In support, the letter referenced testimony from a false confession expert who had observed that once detectives obtain one false confession from a juvenile, they then use that confession to elicit other false confessions from co-defendants. (*Id.*). The letter did not accuse Valentini of fabricating the eight-page confession.

**2. Reinvestigation:** State's Attorney Anita Alvarez ("SA Alvarez") granted the request for a reinvestigation. ASA Mark Ertler and others worked on the reinvestigation along with a number of SAO investigators and a DNA resource specialist. (Doc. 167-1, Alvarez Aff., at 3). The reinvestigation included interviewing witnesses, ordering additional forensic testing, reanalyzing old evidence, and investigating other potential suspects. During this time, "documents were gathered, created, and reviewed," and

these are bates-stamped CCSAO 008401 through CCSAO 008696. (*Id.*). All of these documents appear on the SAO's privilege log since they are all being withheld based on the deliberative process privilege and work product doctrine.

In January 2011, Valentini was promoted to Chief of the Criminal Prosecutions Bureau with responsibility for the multiple divisions and attorneys (approximately 500) within the Bureau, including the DNA Review Unit. In this position, he supervised Mark Ertler's work on the reinvestigation. He also participated in meetings about the reinvestigation and had discussions with others about it, including Saunders' counsel. Plaintiffs assert that Valentini had a conflict of interest and should have been walled off from the reinvestigation and deliberations. They rely on this conflict as one reason for allowing discovery of the SAO's deliberations.[4]

**3. DNA Testing:** On December 3, 2010, Saunders and Swift filed a motion for DNA testing which was later joined by Richardson. (Doc. 176-2, at 7). The SAO filed a motion to dismiss this request on January 19, 2011 but later withdrew its opposition, and an agreed order of testing was entered in March 2011. (*Id.*). In May 2011, the Illinois State Police returned a match to the DNA profile of Johnny Douglas. (*Id.* at 8). Douglas had an extensive criminal history between July 1980 and April 1998, including a murder conviction and a sexual assault conviction. *People v. Thames, et al,* No. 95 CR 9676 (Circuit Court of Cook County Nov. 16, 2011) (found at http://s3.documentcloud.org/documents/267118/englewood-four-order-to-vacate-

---

[4] When counsel for Saunders spoke of the conflict during oral argument, the Court asked whether he had raised this issue back during the reinvestigation. Counsel responded: "The only thing I did was when I had a telephone conversation with him [Valentini] about the case, I said, 'Don't you think there might be a problem with you supervising Mr. Ertler on this matter at this point in time, given the fact that you were the person who took the confession back in 1995?'" Counsel for Valentini denied such a conversation occurred. Valentini testified during his deposition that he inquired of Walter Hehner (Chief Deputy of the SAO) as to whether Valentini should be involved in the reinvestigation process and Hehner "still wanted me to play my role and be involved." (Valentini Dep., at 273-74).

convictions.pdf, last visited on August 7, 2015).  When police were investigating the area where Nina Glover's body was discovered after the murder, Johnny Douglas was present and was interviewed but he denied knowing the victim.

4.    **Motions to Vacate Convictions and Petitions for Certificates of Innocence**:  On May 23, 2011, Plaintiffs filed a joint motion to vacate their convictions with an amended joint motion filed on July 25, 2011.  (Doc. 176-2, at 8).  Regarding the "confessions," the amended motion highlighted the factual inconsistencies among the confessions and the fact that Plaintiffs were teenagers so more susceptible to "police-induced false confessions."  (Doc. 176-2, at 29).  The motion also noted that the interrogations and confessions were not electronically recorded so it was impossible to determine "whether the information relayed by the defendants was volunteered or suggested through the questioning of the police."  (*Id*. at 34).  No allegations were made that Valentini had fabricated Saunders' confession.

On September 14, 2011, the State's Attorney objected to the motion to vacate the convictions and (according to Saunders' counsel) filed a lengthy brief describing the reasons for doing so.  After arguments were held in October 2011, the state court granted the motion to vacate in November 2011.  In January 2012, the SAO announced that it had decided to "*nolle prosequi*" the charges, meaning the case would not be retried.[5]  Thereafter Plaintiffs filed Petitions for Certificates of Innocence which were granted by the state court on September 14, 2012 over the State's Attorney's objections.

---

[5]   "*Nolle prosequi*" is a Latin term meaning "we shall no longer prosecute," and constitutes "a declaration made to the judge by a prosecutor in a criminal case [that] the case against the defendant is being dropped."  (http://legal-dictionary.thefreedictionary.com/Nolle+prosequi, last visited on August 7, 2015).

Several meetings were held within the SAO to discuss the Glover murder, the post-conviction motions, and the Petitions for Certificates of Innocence. (Doc. 167-1, Alvarez Aff., at 3 ¶ 8). Those who attended the meetings were SA Alvarez, Walter Hehner (Chief Deputy of the SAO), Daniel Kirk (then Chief of the SAO Executive Staff), Shauna Bolliker (then First Assistant State's Attorney), Defendant Valentini and his Deputy Joseph Magats, ASA Mark Ertler, and Sally Daly (Communications Director). During the meetings, they "discussed the matters set forth in the pre-decisional material including bates stamped SAO Subpoena 008401 through SAO Subpoena 008696 and deliberated on the proper course of action that the SAO should take with respect to these post-conviction petitions." (*Id.*). SA Alvarez "relied upon these meetings and the information in the investigation to arrive at the SAO's position on the various issues." (*Id.*).

**E.   Discovery Requests**

**1.   Document Requests to Defendant Valentini:**   Plaintiffs filed their civil lawsuits in November 2012. On March 8, 2013, Saunders served written discovery requests on Valentini for all documents relating to the underlying criminal cases, "including through and beyond the post-conviction proceedings and exonerations." (Doc. 160-2). On April 1, 2013, this Court granted Valentini's motion to stay discovery against him pending a ruling on a motion to dismiss based on absolute immunity; however, the Court required Valentini to disclose "whether he has any files for the Glover case separate and apart from those maintained by the State's Attorney's Office." (Doc. 73). For unknown reasons, it appears that Valentini never provided a written response to the March 2013 document requests, but no one followed up on it until

December 2014 when Plaintiffs' counsel discovered the omission. During a Rule 37 conference, Valentini took the position that he did not have custody or control of the reinvestigation documents, which should be subpoenaed from the SAO. He thereafter prepared a written response in which he denied having any post-conviction documents. (Doc. 160-3).

Plaintiffs assert that Valentini, as Chief of the Criminal Bureau, has the legal right to access the SAO documents and thus has custody and control over them. (Doc. 160, at 13). This Court need not resolve this issue since Plaintiffs are obtaining the documents directly from the SAO pursuant to a subpoena. Plaintiffs also argue that Valentini waived the privilege by failing either to assert it in response to their March 8, 2013 document requests, or to provide an associated privilege log. In light of the Court's April 1, 2013 order and the fact that Valentini did not have any documents apart from the SAO's documents, there was no reason for him to assert any privilege or produce a privilege log. At Valentini's deposition, his counsel expressly invoked the deliberative process privilege over questions he believed sought privileged information. Based on this history, Valentini did not waive the deliberative process privilege. *See Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 133 F.R.D. 531, 547 (S.D. Ind. 1990) (no waiver where defendants "appropriately asserted the deliberative process privilege" during depositions).

**2. Subpoenas for Documents to the SAO:** On April 28, 2014, Plaintiffs issued a subpoena for documents to the SAO, including "any and all records and documents in the possession, custody, or control of [the SAO] relating to the Nina Glover homicide investigation and resulting prosecution." (Doc. 160-4, at 8 ¶ 9). On December 5, 2014,

Plaintiffs issued a new subpoena to the SAO which was then re-served on December 22, 2014. Among other documents, this subpoena requested (in item 1) the "complete files" for the Glover investigation and prosecution "including through and beyond the post-conviction proceedings and exonerations." (Doc. 160-6; Doc. 160-8). In addition, the subpoena explicitly requested (in item 6) all documents from the reinvestigation. (Doc. 160-6, at 7 ¶ 6).[6]

In response, the SAO sent a letter objecting to the requests in items 1 and 6 based on the deliberative process privilege, noting that the new subpoena requested documents "'including through and beyond the post-conviction proceedings and exonerations.' In this regard, you have requested documents pertaining to the *deliberations of the State's Attorney* regarding the decision whether to *nolle pros* the charges against the plaintiffs [names omitted] for the murder of Nina Glover as well as the decisions related to the various petitions for certificate of innocence filed by any of those plaintiffs." (Doc. 160-7, at 3) (emphasis added). With respect to item 6, the SAO also objected to the extent that the request sought any documents protected by the "work product privilege." (*Id.*).

Later, the SAO provided Plaintiffs with a privilege log listing *all* of the approximately 300 reinvestigation documents (bates-stamped CCSAO 08401 through

---

[6] The letter stated (in part):

Although this material is already covered by the previous requests, in an abundance of caution and in the event there is any doubt, produce all documents, correspondence, and communications that relate to the [SAO's] reinvestigation into the Nina Glover homicide (which Plaintiffs believe began around 2010, but which may have begun at an earlier time), including all documents, correspondence, and communications that relate to the post-conviction motions filed by Plaintiffs (motion for DNA testing, motion to vacate, and motion for a certificate of innocence that were filed by the Plaintiffs in and around 2010 to 2012). This request includes but is not limited to any and all emails, faxes, notes, letters, memoranda, reports, investigation memos, witness statements, investigation into witnesses or other suspects, and all documents and information relating to Johnny Douglas.

(Doc. 160-6, at 7 ¶ 6).

08696).  As to each entry, the log asserted protection under the deliberative process privilege and (with a few exceptions) the work product doctrine.  The privilege log has been revised a number of times since then to provide more information and to correct errors.

## F.  Valentini's Deposition

A few days after the December 4th subpoena was served on the SAO, Valentini sat for his deposition on December 8 and 9, 2014.  He was asked a number of questions that he declined to answer on the advice of counsel based on the deliberative process privilege.  After approximately nine hours of questioning over the two days, Saunders' counsel said he was reserving the remaining deposition time (approximately one hour) so he could re-depose Valentini in the event the Court ordered production of the withheld reinvestigation documents or required Valentini to respond to questions that he refused to answer based on assertion of the privilege.  (Valentini Dep., at 553).

## G.  State's Attorney Alvarez's Declaration in Support of the Privilege Claim

In response to Plaintiffs' motion to compel, SA Alvarez submitted a declaration in support of the invocation of the deliberative process privilege.  In it SA Alvarez states that she was the person responsible for deciding whether to object to Plaintiffs' post-conviction motions and whether to *nolle pros* the State's case after the SAO reinvestigated the Glover murder.  (Doc. 167-1, Alvarez Aff., ¶¶ 2-6).  She further states that eight Assistant State's Attorneys (Valentini was not one of them) worked on the new investigation along with one DNA specialist.  (*Id.* ¶ 6).  "In the course of this investigation, documents were gathered, created, and reviewed.  These documents, bates stamped SAO Subpoena 008401 through SAO Subpoena 008696, constitute pre-

decisional material that ASA Ertler, other SAO personnel and I *reviewed, considered and discussed* in the course of the investigation of the Glover murder." (*Id.*) (italics added). SA Alvarez then states: "These documents reveal opinions, notes and observations that were central to the discussions and deliberations regarding the Glover murder and whether to *nolle pros* the charges against the [criminal] defendants." (*Id.* ¶ 7).

According to the declaration, several meetings took place after the reinvestigation was concluded during which SA Alvarez and others (including Valentini) discussed the Glover murder, the motions to vacate the convictions and the petitions for certificates of innocence. SA Alvarez states: "In these meetings, we discussed the matters set forth in the pre-decisional material including bates stamped SAO Subpoena 008401 through SAO Subpoena 008696 and deliberated on the proper course of action that the SAO should take with respect to these post-conviction petitions. I relied upon these meetings and the information in the investigation to arrive at the SAO's position on the various issues." (*Id.* ¶¶ 6, 8).

As for Valentini's deposition, SA Alvarez states that he refused to answer certain questions based on advice of counsel since these questions "sought information about the investigation, what facts and information ASA Valentini and the SAO learned during the investigation, what facts and information were discussed in the process, and what facts and information were relied upon in arriving at the determination to *nolle pros* the charges against [Plaintiffs] and the SAO's position regarding [Plaintiffs'] various petitions." (*Id.* ¶ 9).

## DISCUSSION

**A.    The Deliberative Process Privilege**

"The deliberative process privilege protects communications that are part of the decision-making process of a governmental agency."  *U.S. v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993) (citing *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150-51 (1975)).  The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government."  *Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001) (internal quotations omitted).

In keeping with this stated goal, the deliberative process privilege covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of the process by which governmental decisions and policies are formulated."  *Id.* at 9.   A document will be protected "only if it is 'predecisional'— generated before the adoption of an agency policy -- and 'deliberative'—and reflective of the give and take of the consultative process."  *Allen v. Chicago Transit Auth.*, 198 F.R.D. 495, 502 (N.D. Ill. 2001).  This means that "[c]ommunications made subsequent to an agency decision are . . . not . . . protected."  *Farley*, 11 F.3d at 1389.

To determine whether the privilege applies, courts employ a two-part analysis. First, the court must decide "whether the government has shown that the privilege applies to the documents the government seeks to protect."  *Ferrell v. U.S. Dep't of Housing and Urban Dev.*, 177 F.R.D. 425, 428 (N.D. Ill. 1998).  Then, if the government

meets this threshold burden, "the litigant has the burden of showing that it has a particularized need for the documents." *Id*. For the government to satisfy its *prima facie* threshold showing,

> three things must happen: (1) the department head with control over the matter must make a formal claim of privilege, after personal consideration of the problem; (2) the responsible official must demonstrate, typically by affidavit, precise and certain reasons for preserving the confidentiality of the documents in question; and (3) the official must specifically identify and describe the documents.

*Id*. *See also Evans v. City of Chicago*, 231 F.R.D. 302, 316 (N.D. Ill. 2005).

Once the government makes this showing, the Court is free to conduct an *in camera* review of the withheld documents as was done here. Assuming the Court is satisfied that the deliberative process privilege applies to the documents in question, the party seeking the documents must demonstrate a "particularized need" for them. In undertaking such an analysis, the court balances the plaintiff's need for disclosure against the government's need for secrecy, considering such factors as:

> (1) the relevance of the documents to the litigation; (2) the availability of other evidence that would serve the same purpose as the documents sought; (3) the government's role in the litigation; (4) the seriousness of the litigation and the issues involved in it; and (5) the degree to which disclosure of the documents sought would tend to chill future deliberations within government agencies, that is would hinder frank and independent discussion about governmental policies and decisions.

*Ferrell,* 177 F.R.D. at 429.

## B.  Privilege Claim is Overbroad in Seeking to Protect Factual Information

What is apparent from the carefully-worded declaration of SA Alvarez – together with this Court's *in camera* review of the withheld documents – is that the SAO is invoking the deliberative process privilege over every scrap of paper examined, created, or considered during the reinvestigation. In other words, *all* documents are being

withheld regardless of when they were created and what they reveal. No effort was made to individually examine the documents from the reinvestigation files to identify those that reveal deliberations, recommendations, advice, debate, opinions, or analysis regarding positions the State's Attorney should take in relation to the motions to vacate the convictions and the petitions for Certificates of Innocence, and whether to *nolle prosequi* the charges (hereinafter sometimes referred to as "the prosecutorial decisions"). If the deliberative process privilege were construed as broadly as the SAO suggests, a cloak could be placed over *all* factual information developed during a reinvestigation, including witness interviews and the results of DNA testing.

The deliberative process privilege is not so expansive. Discussion of objective facts, as opposed to opinions and recommendations, generally is not protected by the deliberative process privilege. *Environmental Protection Agency v. Mink*, 410 U.S. 73, 87–88, 93 (1973) ("[M]emoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context would generally be available for discovery."); *Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO v. N.L.R.B.*, 845 F.2d 1177, 1180 (2d Cir. 1988) ("Purely factual material not reflecting the agency's deliberative process is not protected."); *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1227-28 (10th Cir. 2007); *K.L. v. Edgar*, 964 F. Supp. 1206, 1208 (N.D. Ill. 1997). "To be considered 'deliberative,' a document should reflect policy or decision-making processes, rather than purely factual or investigative matters." *S.E.C. v. Nacchio*, No. 05 C 0480, 2009 WL 211511, at *3 (D. Colo. Jan. 29, 2009) (citing *Trentadue*, 501 F.3d at 1227).

While acknowledging that purely factual information may not be withheld under the deliberative process privilege, the SAO observes that the privilege applies to "factual matters inextricably intertwined with [predecisional policy] discussions." *Enviro Tech Int'l, Inc. v. U.S. E.P.A.*, 371 F.3d 370, 374 (7th Cir. 2004). That is, purely factual information must be segregated from deliberative material and produced unless it is inextricably intertwined with the privileged material or would itself reveal the deliberative process. *Trentadue*, 501 F.3d at 1227-29. But neither the SAO nor Valentini provide any analysis of how the factual information within the documents at issue is inextricably intertwined with the deliberations. Instead they seem to assume that any fact that is developed during the reinvestigation, and any document that is generated, is necessarily "considered" during the deliberations. Therefore, by divulging facts learned during the reinvestigation or producing a summary of a witness statement, deliberations are revealed.

To be sure, disclosing which witnesses and evidence the SAO considered necessarily reveals the office's thought process to some extent. But "this is true of any investigation by which an agency seeks facts – knowing what questions are asked or which witnesses are interviewed reveals aspects of what the investigator deemed important or worthy of consideration. In a larger sense everything could be considered deliberative." *Reilly v. U.S. E.P.A.*, 429 F. Supp. 2d 335, 352 (D. Mass. 2006). *See also Playboy Enters., Inc. v. Dep't of Justice,* 677 F.2d 931, 935 (D.C. Cir. 1982) ("Anyone making a report must of necessity select the facts to be mentioned in it; but a report does not become a part of the deliberative process merely because it contains

only those facts which the person making the report thinks material. If this were not so, every factual report would be protected as a part of the deliberative process.").

Here Plaintiffs did not serve a subpoena asking specifically (and only) for documents that the State's Attorney considered or discussed during the deliberations. Consequently, the SAO could have produced all documents containing factual information developed during the reinvestigation without revealing that SA Alvarez and her staff gave any weight to particular documents during their deliberations. The SAO cannot avoid producing the documents merely because they now have chosen to identify *all* reinvestigation documents on a privilege log as documents "considered" during deliberations.

No cases have been identified by the SAO that construe the deliberative process privilege as broadly it proposes. Even courts that have adopted a flexible "process-oriented" or "functional" test rather than a more strict "fact/opinion distinction" require a showing that "the unveiling of factual materials would be tantamount to the 'publication of the evaluation and analysis of the multitudinous facts' conducted by the agency…." *Trentadue, 502 F.3d at 1227-28 (*quoting *Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d 63, 68 (D.C.Cir.1974))**.** Here the SAO has not attempted to apply either test and instead has indiscriminately invoked the privilege over *all* materials from the reinvestigation. During the *in camera* review, however, this Court was unable to find any documents in which facts are interwoven into opinions, recommendations, and advice regarding how SA Alvarez should exercise her discretion in relation to the prosecutorial decisions. *Compare Stamps v. Town of Framingham*, 38 F. Supp. 3d 134, 141 (D. Mass. 2014) (deliberative process privilege applied to memorandum a district

attorney wrote to his subordinates "commenting on a draft report regarding [a] shooting, with handwritten notes from a recipient addressing the district attorney's points," where "[i]t was made in preparation for a decision on what action to take after the shooting.").

In her declaration, SA Alvarez argues that the reinvestigation documents and information must be protected from disclosure (in part) to ensure that the SAO has "freedom to conduct investigations," and to avoid a "disincentive" to an "open and thorough investigation." (Doc. 167-1 ¶ 10). She also expresses concern that disclosure "could have a chilling effect on future State's Attorneys who decide to investigate a case where a defendant has been convicted but claims innocence on the basis of new evidence." (*Id.* ¶ 10). This Court need not engage in a debate over whether disclosure of *facts* developed or summarized during a reinvestigation would have a chilling effect on future investigations. The privilege that has been invoked here is one that protects deliberations within the SAO about the prosecutorial decisions – not some general law enforcement privilege designed to insulate all investigatory materials.[7]

Adopting the SAO's position would also be contrary to the Court's duty to narrowly construe the privilege. *United States v. Board of Educ. of City of Chicago*, 610 F. Supp. 695, 698 (N.D. Ill. 1985) ("[S]ince the benefits are 'at best indirect and speculative,' [the privilege] must be strictly confined 'within the narrowest possible limits

---

[7] Before the enactment of federal and state Freedom of Information Acts ("FOIA"), "a privilege protecting the investigative results of government agencies appears to have been sporadically recognized but ill-defined…."' 1 McCORMICK ON EVID. § 108(B) (7th ed.). Now legislatures protect against disclosure of certain types of law enforcement files by enacting very specific exemptions to FOIA. Under the Illinois FOIA statute, 5 ILCS 140/1 *et seq.*, a public body may withhold information if, for example, releasing it would: disclose unique or specialized investigative techniques other than those generally used and known (Section 140/7(1)(d)(v)); endanger the life or physical safety of law enforcement personnel or any other person (Section 140/7(1)(d)(vi)); or obstruct an ongoing criminal investigation (Section 140/7(1)(d)(vii)). The Illinois Supreme Court has held that the Illinois FOIA statute applies to State Attorneys' Offices. *Nelson v. Kendall County*, 2014 IL 116303, at ¶ 27 (2014) (citations omitted). It also reaffirmed that there is a presumption of full disclosure, exemptions are to be construed narrowly, and the public body seeking to withhold documents has the burden of proving by clear and convincing evidence that the exemption applies. *Id.* at ¶ 26.

consistent with the logic of [its] principles.'") (quoting *In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3d Cir.1979)).  *See also Soucie*, 448 F.2d at 1078 (warning that "courts must beware of 'the inevitable temptation of a governmental litigant to give [this exemption] an expansive interpretation in relation to the particular records in issue.'").

Oddly, the SAO suggests that the motion to compel must be denied to avoid violating the separation of powers doctrine.  (Doc. 167, at 1-2).  But the cited cases are inapplicable since they involved judges who *sua sponte* demanded that prosecutors provide information about their deliberations during ongoing criminal prosecutions.  *See United States v. Zingsheim*, 384 F.3d 867 (7th Cir. 2004); *In re United States*, 503 F.3d 638 (7th Cir. 2007).  In another case that is cited, the judge began his own inquiry of prosecutors for perceived misconduct in releasing grand jury materials for use in a civil lawsuit.  *See In re United States*, 398 F.3d 615 (7th Cir. 2005).  Here, the criminal prosecution and post-conviction proceedings are long over, and a party in a civil lawsuit has issued a subpoena to the SAO for documents.  The Court is doing nothing more than determining whether the specific privilege invoked by the SAO as a basis for withholding those documents applies.

Against this backdrop, the Court turns to the specific documents withheld by the SAO based on the assertion of the deliberative process privilege.

## C.     Examination of Withheld Documents

Since the SAO did not examine the reinvestigation documents individually to identify documents (or portions of documents) revealing deliberations, this Court conducted an *in camera* review of every document that was withheld.

1.      **Documents from Underlying Criminal Investigation:** Among the withheld reinvestigation materials are several documents that were created during the underlying criminal investigation in the 1990s.   These include the confessions of Plaintiffs, Swift, and Fincher, as well as Valentini's memo regarding the oral statement of Richardson that was sent to his then supervisor (Charles Burns) when Valentini was in the Felony Review Unit.   (CCSAO 08638-08686).   The SAO also withheld its "Penitentiary letter" for Saunders (CCSAO 08490-91).   This was written shortly after the sentencing in 1997 though the letter bears a date of August 11, 2010 when it presumably was printed after receiving the August 10, 2010 letter from the Innocence Project.  Of course, none of these old documents reveal the deliberations in 2011 and 2012 regarding the prosecutorial decisions.  Plaintiffs undoubtedly already have these documents but, if not, they must be produced.

2.      **DNA Review Unit Proceeding Blueback:** Within the SAO, a document called a "Blueback" is provided in blank to the lead trial prosecutor at the point when an indictment is returned.  The Blueback is used to record activities in court and significant events.  *See Patrick v. City of Chicago*, __ F. Supp. 3d __, 2015 WL 3989152, at *2 (N.D. Ill. 2015).   The Blueback withheld in this case, entitled "DNA Review Unit Proceeding Blueback" (CCSAO 08547-08554), contains handwritten notes under the heading "Court Dates-Court Proceedings" with entries starting on December 3, 2010 (the day Saunders and Swift filed a motion for DNA testing) and ending on January 17, 2012 (when the criminal charges were dismissed).   In addition to the date, each handwritten note lists the participants and what occurred.  Most of the entries in this Blueback describe calls and meetings in which one or more of Plaintiffs' attorneys

participated. A couple of entries note simply that additional analysis was requested or received from the Illinois State Police. The last two pages of the Blueback are entirely blank. Because none of the entries reveals the content of any deliberations regarding the prosecutorial decisions that SA Alvarez eventually made, these documents must be produced.

     **3.** **Investigative Reports and Investigator Request Forms:** Several of the withheld documents are "Investigative Reports" in which the results of interviews and other investigation efforts are summarized. Often there are corresponding "Investigator Request Forms" that triggered the investigative work. Two of the Investigator Request Forms and resulting reports relate to efforts to locate former ASA Johnson (CCSAO 08555-08556) and a later interview of Johnson (CCSAO 08557-08558).[8] Not only do these documents fail to reveal any deliberations, but copies of these same documents already were produced in discovery. (SAO 03433-03434 and SAO 03435-03436). As a result, the SAO has now withdrawn the claim of privilege over these two Investigative Reports and the accompanying Request Forms. At the Court's request, the SAO then researched whether any of the other withheld Investigative Reports had been produced during the post-conviction proceedings. Not surprisingly, several had been, and the SAO has now withdrawn its claim of privilege as to these as well (CCSAO 08568, 08582, 08584, 08586, 08588, 08591, 08593, 08596, 08599, and 08603). (Letter from P. Castiglione of 4/20/15).

     While the SAO maintains its claim of privilege as to several other Investigative Reports and Investigator Request Forms, all of those documents are factual in nature

---

[8]   Another copy of these same documents was also withheld: CCSAO 08574-08575 (efforts to locate ASA Johnson) and 08576-08577 (interview of ASA Johnson).

and none reveals deliberations regarding the prosecutorial decisions. These additional Investigative Reports must therefore be produced (CCSAO 08560, 08562-567, 08569-573, 08579, and 08636-637), as well as all of the Investigator Request Forms (CCSAO 08559, 08561, 08578, 08580-581, 08583, 08585, 08587, 08589-590, 08592, 08595, 08598, 08601-602, 08604, 08606, 08608, 08610, and 08612).[9]

4.    **Case Fact Sheets/PROMIS Sheets:** Case Fact Sheets/PROMIS Sheets are documents consisting of criminal histories, case procedural histories, and typewritten case summary notes as entered into the SAO's internal database. One such document withheld by the SAO relates to a case in which Johnny Douglas was the murder victim (CCSAO 08431-34). The others appear to be multiple copies of the Case Fact Sheet (or portions of it) created in the Nina Glover case but printed during the reinvestigation. (*See* printout on August 10, 2010 (CCSAO 08436-08472) and printout on December 7, 2010 (CCSAO 08473-489)). Based on the *in camera* review, the information on these documents dates back to the original investigations and does not reveal any deliberations. All of these documents must be produced.

5.    **Advanced Person Search Results:** Advanced Person Search Results from Accurint (or the equivalent run on the LexisNexis Investigative Portal) provide contact information about various persons (e.g., names, dates of birth, social security numbers, telephone numbers and any associated addresses). These reports were run for Fincher and a variety of other persons whose names are not recognizable to the Court. (*See* CCSAO 08409-08410, 08594, 08597, 08600, 08605, 08607, 08609, 08611, and 08613). While these documents do not reveal any deliberations, they also

---

[9]    To the extent that any documents in this category or others are ordered to be produced, the SAO may redact social security numbers and dates of birth.

appear to be useless to Plaintiffs.  Since disclosure would unnecessarily reveal non-public information concerning several persons, the SAO is to identify the names of the persons for whom it has run these searches but need not produce the underlying reports.  If Plaintiffs determine that they require the reports, then the social security numbers and dates of birth may be redacted.

Another reinvestigation document that has been withheld was obtained from a different type of search and uncovered evidence of criminal conduct by a witness (CCSAO 8688).  This document reveals no deliberations and must be produced.

**6.      Court Decisions:** The SAO has withheld as privileged copies of several court decisions, including the appellate decision affirming Saunders' conviction. (CCSAO 08689-08696).  Plaintiffs are well aware of the Saunders decision so have no need for it.  As for the other court decisions, these do not contain any factual information gathered during the reinvestigation and would potentially reveal the SAO's legal analysis during the deliberations.  They need not be produced.

**7.      SAO Summaries, Notes and Abstracts:** After the DNA Review Unit opened a review of the Glover case at the request of the Innocence Project (as reflected in CCSAO 08401, which should be produced), ASA Ertler and others prepared various summaries of the underlying events, evidence, and court proceedings back in the 1990s.  (*See* CCSAO 08402-08408, 08411-15).  They also prepared summaries of: the criminal history of Johnny Douglas (CCSAO 08416-08417); inventories of evidence (CCSAO 08418); and the DNA test results (CCSAO 08419).  Some of the summaries are in the form of memoranda.  The earliest, dated May 27, 2011, is from ASA Ertler to Valentini and Deputy Chief Magats and provides an extremely short (one page)

summary of the entire case, including sentencings, post-conviction DNA analysis, and testing in process (CCSAO 08496-97). All the other memoranda are dated December 8, 2011 and each provides an abstract of the transcript from court proceedings in the 1990s: Swift's bench trial (CCSAO 08615-08620); the bench trial of Saunders and Richardson (CCSAO 08621-08625); Fincher's motion to quash arrest (CCSAO 08626-08628); the motions of Richardson and Saunders to quash arrest and suppress evidence (CCSAO 08629-08631); Saunders' motion to suppress statement (CCSAO 08632-08633); and Thames' motion to suppress statement (CCSAO 08634-08635).

None of these summaries provides any insight into deliberations over the prosecutorial decisions that were made. This Court agrees with the recent observations of Magistrate Judge Cole who reviewed similar reinvestigation materials  and then rejected the SAO's privilege claim, stating:

> The vast majority of each page of each document does not reflect the author's impressions, theories, hypotheses, recommendations for future action or how an issue might be resolved. There is no assessment of past errors or opinions on what should have been done. There are no communications which if disclosed would temper the candor of government staff "with a concern for appearances . . . to the detriment of the decision-making process.'" . . . . In the main, the documents . . . are merely factual narratives or synopses of what was recorded in police reports, pretrial motions, or  trial transcripts.

*Patrick,* 2015 WL 3989152*,* at *6.

While the SAO's privilege log also invokes the work product privilege as a basis for withholding these documents, the SAO fails to discuss the basis for this claimed privilege in its opposition brief. Nor does it respond to cases Plaintiffs cite in which courts found that the work product doctrine does not apply where the SAO is not a party to the pending civil litigation. *See Ostrowski v. Holem*, No. 02 C 50281, 2002 WL

31956039, at *4 (N.D. Ill. Jan. 21, 2002) (work product doctrine did not apply "when a prosecutor in a prior criminal investigation later objects to discovery by a litigant in a related and subsequent civil lawsuit.") (citing *Hernandez v. Longini*, No. 96 C 6203, 1997 WL 754041, at *2 (N.D. Ill. Nov. 13, 1997)).[10]

Even if the work product doctrine applied here, the materials are not core work product revealing mental impressions and opinions but, rather, factual work product subject to disclosure based on a showing of need. *Patrick*, 2015 WL 3989152, at *6-7 ("The fact that they were selected for submission to some higher authority reveals nothing other than the compiler's attempt at comprehensive evidence gathering. These documents most assuredly are not work product.").

In sum, the Court finds that none of these summary documents qualifies for protection under the deliberative process privilege or the work product doctrine. As in the *Patrick* case, the SAO engaged in an indiscriminate and therefore unpersuasive assertion of privilege. *Id.* ("[D]efendants have not identified any particular entry in any document they claim is protected. Instead, they insist that not a single line of any of the materials they have submitted to me is outside the scope of the deliberative process privilege or work product doctrine. That indiscriminate assertion of privilege is incorrect and simply not sustainable.").

---

[10] In *Schomburg v. New York City Police Dept.*, 298 F.R.D. 138 (S.D.N.Y. 2014), the court held that the privilege set forth in Rule 26(b) was unavailable for the non-party prosecutor but said the work-product doctrine articulated in *Hickman v. Taylor*, 329 U.S. 495, 508 (1947), and its progeny may still apply. 298 F.R.D. at 142. The SAO has not raised this argument or attempted to distinguish Plaintiffs' work-product cases by noting (for example) that the cases did not involve claims against a current and former prosecutor and their employer, Cook County, "which consists in part of its Cook County State's Attorney's Office." (Doc. 1, Cmplt. ¶ 21). This Court declines to consider these arguments that were not raised. *United States v. Alden*, 527 F.3d 653, 664 (7th Cir. 2008) (it is not the obligation of the court to research and construct the legal arguments available to the parties).

**8.    Handwritten notes:** The reinvestigation documents that were withheld include a handful of handwritten notes.   Some of these simply list names, phone numbers and case numbers (CCSAO 08420-21, 08493).   One has a drawing (CCSAO 08423) and perhaps is related to the Jerry Fincher interview summarized in a Report of Investigation (CCSAO 08570).   Another page of handwritten notes is a list of entities to subpoena and records to request (CCSAO 08435), while another appears to be notes of a homicide statement given to Joshua Tepfer, who was then counsel for Swift.  (CCSAO 08687).   None of these documents qualifies for protection under the deliberative process privilege.

**9.    Draft Pleadings:** Three of the documents that have been withheld are described on the log as "ASA draft pleadings with handwritten notes and analysis" and an unknown date.    (CCSAO 08425-08430).    Each of the three pleadings is a "Stipulation" of what a particular witness would say if called to testify in a criminal case brought in 2008 against Minoso Winters who reportedly was acquitted of the murder of Johnny Douglas based on self-defense.   Even assuming the draft stipulations were modified before filing (or were never filed at all), they do not reveal deliberations in 2011 and 2012 regarding the prosecutorial decisions involving Plaintiffs.   They    must    be produced.

**10.    Emails:** No emails appeared on the SAO's initial privilege log.  The SAO's position was that it could not search for responsive emails from the period of the reinvestigation since emails were not retained that far back.  Later, the SAO reported that these old emails were accessible in an archive that the County would search upon request, but the SAO objected to the 119 search terms proposed by Plaintiffs.  Given

the reported lag time between the SAO requesting a search and the County performing it, the Court directed the SAO to move ahead with a high-level search: the SAO and Valentini were ordered to search for (but not yet produce) emails written by Valentini that contained the names of any of the Plaintiffs or Swift or the case numbers. (Doc. 187). On or about July 2, 2015, the SAO produced all of the recovered emails and attachments to the Court for *in camera* review (CCSAO 08697-09292), but is only asserting privilege over a subset of them, as discussed below.

      **a.**     **Communications between Valentini and his Attorneys:** Certain of the emails contain communications between Valentini and his counsel regarding perfunctory scheduling and other matters pertaining to this case. These emails need not be produced based on attorney-client privilege and lack of relevancy. (*See* CCSAO 09255-09292).

      **b.**     **Reports:** The SAO has asserted the work product privilege over email communications between Valentini and others regarding various annual and other reports for the Criminal Prosecutions Bureau that are attached to the emails. (CCSAO 08722-08960, 08992-09173, 09174-09191, 09211-09217, 09225-09239). The bulk of these reports consist of summaries and analyses of cases that have nothing to do with Plaintiffs. The only possible exceptions are the portions of CCSAO 08889, 09129, 09182-09183, and 09228, which summarize Plaintiffs' own criminal cases. The SAO should produce these pages, but may redact information not pertaining to Plaintiffs.

      **c.**     **60 Minutes Documents:** In December 2012, the television news series 60 Minutes aired a story featuring Plaintiffs and their cases. The SAO prepared a written response to the piece, and there are several emails relating to that response, as

well as drafts of the letter SA Alvarez ultimately sent to 60 Minutes. (CCSAO 08961-08991). The SAO has not asserted any privilege over these documents but claims that they are irrelevant to this lawsuit. Given that the emails and drafts expressly discuss Plaintiffs and the Nina Glover murder and include fact checking by Valentini, the Court finds that they must be produced.

    **d.**  **Miscellaneous Emails:** The SAO has asserted the work product and deliberative process privileges over a string of March 1, 2012 emails between Valentini, ASA Ertler and ASA Magats regarding an order that Plaintiff Thames was then seeking from Judge Biebel. This was after the criminal charges had been dismissed but before the Certificates of Innocence were granted on September 14, 2012. The deliberative process privilege applies to these emails, so they need not be produced. (CCSAO 09196-09197). Nor does the SAO need to produce the agenda for a meeting that possibly was to include discussion of the Nina Glover case. The agenda and emails regarding that meeting are irrelevant. (*See* CCSAO 09200-09202).

    The documents found at CCSAO 09218-09224, on the other hand, must be produced. These relate to potential responses to questions from the public/press regarding the SAO's actions in vacating the convictions and sentences of three individuals convicted in the 1991 murder of Cataresa Matthews (also known as the Dixmoor case). One page of this document discusses the Nina Glover case.

    The SAO has not asserted any privilege over the emails found at CCSAO 09240-09246 and 09253-09254. Since Valentini described factual errors in the news story about Plaintiffs' cases that are discussed in the emails, the emails are relevant and must be produced.

The multi-page document found at CCSAO 09247-09252 contains updates from Valentini about a number of DNA and Special Litigation cases, including the one involving Plaintiffs. The SAO must produce the one page that actually references Plaintiffs (CCSAO 09248) since it does not contain any deliberations. Any information on that page not relating to Plaintiffs may be redacted.

The emails found at CCSAO 09192 and 09203 address an attached timeline (CCSAO 09193-95, 09204-09206) and memo (CCSAO 09207-09210) created during the reinvestigation. This Court has already examined copies of the same timeline and memo and found them not to be privileged. *See supra* at 28-30. (CCSAO 08402-08404; 08496-08497). The emails likewise contain no protected deliberations. All of these documents must be produced.

The email attaching DNA test results from the Glover case (CCSAO 09198-09199 and CCSAO 08419) is not privileged and must be produced. Oddly, the SAO asserted privilege over one copy of the results but not the other.

Any remaining documents not expressly addressed in this opinion have been found by the Court to be irrelevant to this case and so need not be produced. (See CCSAO 08697-08721).

The Court declines to require additional email searches of the archive using different search terms. Given the Court's rulings on the privilege issues, there is little justification for spending time and resources searching for a needle in a haystack based on the remote chance that Valentini made a statement in an email between 2010 and 2012 that somehow bears on whether he did or did not fabricate a confession in 1995.

**D.      Claim of Deliberative Process Privilege at Valentini's Deposition**

In addition to documents, Plaintiffs seek testimony from Valentini that he declined to provide during his deposition based on the deliberative process privilege.  In some instances the invocation of the privilege was appropriate and in other instances it was not.   Before turning to the specific deposition questions, the Court considers two preliminary issues raised by Plaintiffs.

1.      **Valentini's Participation in the Deliberations:**  In light of certain testimony by Valentini, Plaintiffs initially raise the question of whether he actually participated in the deliberations.  If not, they argue that he cannot invoke the privilege. (Doc. 160, at 8).  Valentini testified that he was unable to say whether he participated in the "process that led to the decision" to oppose the motions to vacate since he did not recall when the decisions were made.  (Valentini Dep., at 284-86).  He answered "not really" when asked if he participated in the "decision" to dismiss the indictments.  (*Id.*). And he said he did *not* participate in the "process leading to the decision" to oppose the Certificates of Innocence.   (*Id.*). Valentini's counsel attributes these responses to his client not fully understanding the "parameters and application" of the privilege which is the job of counsel.  (Doc. 169, at 7).  Valentini acknowledged as much when he testified that he was uncertain how to answer certain questions because he did not know what the deliberative process is and when it began and ended. (Valentini Dep. at 201-02 summarized *infra* at n.11).

SA Alvarez, on the other hand, was clear in her declaration that Valentini attended meetings where they deliberated over the proper course of action the SAO should take with respect to the post-conviction motions and petitions for Certificates of

Innocence. (Doc. 169-2, Alvarez Aff. ¶ 8). In addition, one page of the Blueback that the Court has ordered to be produced reflects Valentini's attendance at a meeting with SA Alvarez, ASA Mark Ertler and high-ranking members of the SAO one week before SA Alvarez decided to dismiss the charges. (CCSAO 08552). Finally and as discussed in detail later, Plaintiffs' main theory for why they have a particularized need for discovery of the deliberations is precisely because Valentini *was* involved and (they believe) attempted to improperly influence the prosecutorial decisions in order to cover up his wrongdoing in 1995. This Court is satisfied on the record before it that Valentini was sufficiently involved in the decision-making process that he may invoke the privilege in response to questions that he is unable to answer without revealing the content of the deliberations.

2.    **Exception Where Government's Intent is at Issue:** Plaintiffs also argue that the deliberative process privilege does not apply at all here because Valentini's intent and misconduct are at issue. (Doc. 160, at 8). In support of this argument, they cite two easily distinguishable retaliation cases. In *United States v. Lake County Bd. of Comm'rs*, 233 F.R.D. 523, 528 (N.D. Ind. 2005), the plaintiffs alleged that they were fired by the Board of Commissioners in retaliation for their efforts in bringing an affordable housing development into Lake Station, Indiana. *Id.* at 525. The court first expressed doubt that "the deliberative process and mental process privileges ever were intended to prohibit inquiry into routine personnel decisions," such as whether to fire an employee. *Id.* at 528. More importantly, the court stressed that in a retaliation case, "the plaintiff's case rests on the [public officials'] decisionmaking process itself," rendering the privilege inapplicable. *Id. See also Lewis*, 2012 WL 5499448, at *2

(privilege did not apply to documents relating to a governmental decision to ban gaming systems at a detention facility because the plaintiffs alleged that the ban had been implemented in retaliation for their filing the lawsuit).

In both of these cases, the courts relied on an exception to the deliberative process privilege that applies "where intent is central to proving a claim." *Lewis*, 2012 WL 5499448, at *2. *See also Lake County Bd. of Comm'rs*, 233 F.R.D. at 526 ("[T]he deliberative process privilege simply does not apply in civil rights cases in which the defendant's intent to discriminate is at issue."). In the case at hand, the complaint raises no claims based on the decision-making process in the SAO in 2011 and 2012. Rather, the claim against Valentini is based on his alleged fabrication of Saunders' confession in 1995. This claim is independent of the decision-making process in the SAO sixteen years later, standing regardless of whether Valentini played any role in the deliberations. For this reason, the exception does not apply and the deliberative process privilege may be invoked by Valentini where appropriate.

This Court now turns to the specific questions posed to Valentini to which he invoked the privilege.

**3. Questions Regarding the Content of Deliberations:** Valentini testified that he attended a meeting within the SAO after Judge Biebel granted Plaintiffs' motions to vacate their convictions but before SA Alvarez decided to dismiss the indictments. (Valentini Dep., at 224-25). He identified others at the meeting, including ASA Mark Ertler, SA Alvarez and the SAO First Assistant, Chief Deputy, and Director of Communications. After eliciting that Valentini did not believe the Director of Communications participated in the deliberations, Saunders' counsel asked: "And

37

would you please tell me all of the different things that were discussed at that meeting." Valentini declined to answer based on the deliberative process privilege. (*Id.* at 221, 225). This Court agrees that, assuming the discussion at this meeting was about whether or not to dismiss the criminal charges, Valentini was entitled to decline to answer based on the privilege.

Plaintiffs argue that the privilege does not apply because the SAO has now taken "public, formal positions" on the prosecutorial decisions involving Plaintiffs. (Doc. 160, at 9-10). Counsel for Saunders also noted during oral argument that the SAO filed lengthy pleadings setting forth the reasons for opposing the motions to vacate the convictions and the petitions for Certificates of Innocence. Plaintiffs stress that the privilege cannot protect any opinions or recommendations that were adopted as the final position of the SAO. (*Id.*). But here Plaintiffs are not seeking production of a draft document that was later adopted and made public, but rather testimony regarding everything that was said during the deliberations that preceded the public decisions and the public rationale. In other words, Plaintiffs seek non-public information about the internal debate that occurred and the specific arguments made by those participating in deliberative discussions. This is exactly the type of information that the privilege is designed to protect. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) ("The privilege...serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism....").

While Valentini may invoke the deliberative process privilege as a basis for declining to answer questions regarding the content of the SAO's deliberations, this

does not mean he may decline to answer "any questions about the content of communications he had about the reinvestigation of the Englewood case." (Valentini Dep., at 196). It is only where the answer to a question would reveal the deliberations over prosecutorial decisions – the analysis, opinions, recommendations, debate, or advice – that Valentini may invoke the privilege.

**4.    Questions Regarding Facts Learned During the Reinvestigation:**
Plaintiffs certainly are entitled to discovery regarding evidence gathered during the reinvestigation, including testimony from Valentini regarding such evidence. This Court disagrees with Valentini's assertion that the "SAO's *investigation* ... is protected from disclosure by the deliberative process privilege." (Doc. 169, at 2) (emphasis added). For reasons discussed previously, this Court is not persuaded that disclosure of how the case was investigated and what evidence was obtained is tantamount to disclosure of the analysis that later occurred in deciding how to respond to the motions to vacate the convictions. Yet during the deposition, counsel sometimes instructed Valentini not to answer questions to the extent that he "learned that information solely as part of the deliberative process *in reinvestigating this claim.*" (Valentini Dep., at 201) (emphasis added). Not surprisingly, this advice led Valentini to become confused about the scope of the privilege and what questions he was permitted to answer given his uncertainty about when and how he learned information and when the deliberative process began and ended. (*Id.* at 201-02, 208-09).[11]

---

[11] The following exchange demonstrates this:

Q. Okay. Okay. But you saw information on Johnny Douglas. Did the information that you saw include the fact, okay, that Johnny Douglas' DNA matched the sperm DNA recovered from the deceased Ms. Glover in the postmortem autopsy?

What matters for purposes of determining whether the deliberative process privilege applies is not when or how Valentini learned of the evidence but whether his answer would reveal the deliberations within the SAO regarding the prosecutorial decisions. By acknowledging that he saw or became aware of the DNA results— regardless of when and how this occurred—nothing would have been revealed about what advice, debate, analysis and arguments were made during the deliberations. It would be different if Valentini instead had been asked to divulge whether the DNA results were discussed during the deliberations and what was said about their significance. To the extent that Valentini is asked only to reveal factual information from

---

MR. NOWINSKI: Objection: Form and foundation. And to the extent that you learned that information solely as part of the deliberative process in reinvestigating this claim, I'm going to instruct you not to answer. Should you have gotten that information outside of that purview, then you may answer.

Q. Can you answer the question?

A. I don't know. I don't know when the deliberative process begins or ends or --

Q. Fine. But you can say that it was the deliberative process; is that correct?

\*         \*         \*         \*

A: I don't know what the deliberative process is. It's a legal term that appears to apply civilly that I'm not really all that familiar with.

\*         \*         \*         \*

Q: Did there come a time, even before any deliberative process, that you learned that Johnny Douglas was the source and the only source of sperm recovered from the vaginal cavity of Nina Glover in a sample that was collected postmortem?

\*         \*         \*         \*

A: In order for me to answer that, I would have to recall exactly when I found out about the DNA involving Johnny Douglas. And I don't recall exactly.

Q. But you did learn it?

\*         \*         \*         \*

A: At some point, I did learn that Johnny Douglas' DNA profile was found inside of Nina Glover.

(*Id.* at 201-02, 208-09).

the reinvestigation or about his own knowledge of factual information, he may not invoke the deliberative process privilege.

5. **Questions Regarding Valentini's Beliefs And Opinions:** Counsel for Saunders also attempted to explore Valentini's beliefs about his client's guilt or innocence, asking "Is it your personal belief in this case that Mr. Saunders is actually guilty of participating in the murder of Nina Glover?" (Valentini Dep., at 240). Valentini answered: "I don't know." Counsel followed up by asking "If you yourself were uncertain, why is it that you opposed Mr. Saunders' motion to vacate the conviction?"[12] Valentini properly declined to answer this question since it sought to learn whether he advocated a position during the deliberations, what that position was, and the reasons for his position. (*Id.* at 241, 246-47).

The privilege was also properly invoked in response to confusing questions designed to discover Valentini's analysis of the impact of the new DNA and other evidence. For example, Saunders' counsel said: "I'm just asking you about if a jury heard all of that new evidence, the DNA and all the other evidence about Johnny Douglas, do you believe that it would probably change the result if a new trial was granted?" Valentini responded that he did not know. (Valentini Dep., at 247-48). Counsel then asked if he had thought about it and Valentini said he had. (*Id.* at 248). When counsel next attempted to elicit Valentini's analysis of the evidence, he declined to answer:

---

[12] This Court is unaware of any evidence in the record regarding whether Valentini recommended that SA Alvarez oppose the motions to vacate. In their brief Plaintiffs state that "Defendant Valentini's Bureau" opposed the motions and later "moved to dismiss the indictment...." (Doc. 160, at 3). In reality, the State's Attorney made the decisions and an ASA within the Criminal Prosecutions Bureau (of which Valentini was the Chief) carried out those decisions by filing the necessary pleadings.

Q. So now I'm asking you, what are the factors in your own mind, okay, that -- that move in the direction that if a new jury heard the evidence about Johnny Douglas and heard the evidence about the DNA that it would probably change the result? And then I will ask you the second question, which is what are the factors in the other direction?

                \*       \*       \*       \*

MR. NOWINSKI: To the extent that these were factors that were only learned in the deliberative process, I'm going to instruct him not to answer.

(*Id.* at 255-56).

Saunders' counsel also sought to learn Valentini's analysis regarding the weight of the evidence. He asked: "[H]ave you learned of any evidence at all as you sit here today other than the confessions of Mr. Saunders and the other four young men that would militate in the direction that a verdict would not be changed?" Valentini responded "no." (*Id.* at 257). But when counsel again probed about "what fact or factors changed your mind from...believing he was guilty to no longer being sure of it," Valentini declined to answer based in his attorney's instruction that he should not do so "[t]o the extent you learned of factors during the process of the reinvestigation, the determination of whether or not to vacate or to dismiss the charges…." (*Id.* at 289-90).

Pressing further, Saunders' counsel asked whether in Valentini's "own mind, you believe that Johnny Douglas was involved in the attack and murder of Ms. Glover," to which he responded that he did not know. (*Id.* at 290). When asked whether he had "heard evidence suggesting that he was," Valentini acknowledged that he had "heard evidence which makes it possible." (*Id.* at 290-91). Counsel then sought to learn Valentini's analysis and theories, asking the following questions:

- What are your reasons for not thinking that Johnny Douglas was involved?

- In your own mind as you went over this case, okay, what, if any, possible theories did you come up with that would explain on the one hand Mr.

Saunders giving you the statement that you attribute to him yet him being completely innocent?

- So without telling me what other theories you have, are you saying that during your meetings with other people in your office, you came up with alternative explanations to reconcile Mr. Saunders' statement and him being innocent?

Valentini followed his attorney's instruction not to answer any of these questions to the extent that he would be basing the answer on information learned during the deliberative process. (*Id.* at 291, 551-52).

This Court finds that the privilege was properly invoked by Valentini in response to these irregular deposition questions. It is likely that during the SAO's deliberations about the prosecutorial decisions, they discussed the weight of the evidence and whether it was sufficient for a jury to convict, as well as the other questions posed to Valentini. Since Valentini was present for the deliberations, it is understandable that providing answers to the questions would reveal analysis, arguments, and discussion from the deliberations.

**E.** **Particularized Need**

To the extent the privilege was properly invoked, Plaintiffs assert that they have a particularized need for the information that is sought sufficient to overcome any privilege. As noted, this argument requires the Court to balance Plaintiffs' need for disclosure against the SAO's need for secrecy, considering the five factors summarized previously. (*See* supra at 19).[13]

---

[13] Since the Court has found that virtually none of the reinvestigation documents reveals deliberations, there is no need to discuss Plaintiffs' particularized need for such documents. Nor is it necessary to consider particularized need as to Valentini's responses to deposition questions about evidence developed during the reinvestigation (or his knowledge of such evidence) given the ruling that Valentini must answer these questions.

1.      ***Evans* Case**: In asserting a particularized need for evidence of the SAO's deliberations, Plaintiffs rely heavily on the decision in *Evans v. City of Chicago*, 231 F.R.D. at 308-09.   There the plaintiff received a pardon from the Governor that his counsel planned to offer at trial as evidence of his actual innocence.   When the defendant police officers subpoenaed documents from the Governor's office to learn the basis for the pardon so they could try to challenge its validity, the Governor's office invoked the deliberative process privilege.  231 F.R.D. at 308, 309.  The court assumed the privilege applied and then found that the defendant officers had a particularized need for the information because it was "the best evidence of the weight that should be accorded to the pardon."  *Id.* at 317.

Here, the Illinois state court granted petitions for Certificates of Innocence; there was no pardon from the Governor.   Since Plaintiffs will be the ones seeking to offer those Certificates of Innocence into evidence, they can hardly claim to need evidence of the SAO's deliberations to challenge the validity of the court's decision granting the certificates.   Of course, the SAO deliberations would also be irrelevant since the court granted the certificates rather than the SAO.

2.      **Relevance of Valentini's Conduct in 2010-2012**: Plaintiffs also argue that they have particularized need for the discovery at issue because Valentini's conduct in 2010 through 2012 is probative of his intent to fabricate Saunders' confession in 1995:

> His conduct during the reinvestigation, including the fact that his office opposed vacatur in this case but not in [a] similar case [Dixmoor] around the same time, is relevant to Plaintiff's claim because it sheds light on Valentini's prior misconduct and intent by demonstrating his state of mind, bias, and conflict of interest.

(Doc. 172, at 5). They further assert that in order to "explore crucial issues for this civil rights case" they must ask Valentini "questions related to intent, bias, bad faith, and even ongoing misconduct and coverup. For example: What role did [he] play in the decisions to oppose vacatur and a certificate of innocence? Why had his office opposed this case when it had not opposed vacatur in another case at about the same time, involving substantially similar facts?" (Doc. 160 at 4-5).

During oral argument, the Court pressed for more specifics on the potential relevancy of Valentini's current opinions and beliefs, and his role in the deliberations, to whether he fabricated a confession more than 16 years ago. In response, counsel for Saunders suggested that if Valentini participated in the deliberations and opposed the motions to vacate the convictions, this would amount to a "coverup" of his misconduct in 1995 and therefore would be evidence of his consciousness of guilt. At the same time, however, counsel suggested that it was not only Valentini who was to blame for the decisions:

> [O]ne of the main reasons they opposed it here and didn't oppose it in Dixmoor is that in this case...it became necessary to do what they could to protect Fabio Valentini because of his new position as one of the very top people in the Cook County State's Attorney's Office whereas the confessions in Dixmoor were taken by an assistant who had left the office a number of years ago.

(Doc. 178, Tr. of 3/10/15, at 21-22). Counsel further observed that "[g]etting to the truth and how these decisions were made would be extremely important to our client...." (*Id.* at 33).

While Plaintiffs obviously were perplexed and unhappy with the prosecutorial decisions made by SA Alvarez following the reinvestigation, and would like to probe (and attack) how she reached those decisions, this does not entitle them to discovery of

the deliberations absent a showing of a particularized need.  This Court is not remotely persuaded, however, that Plaintiffs have demonstrated a need for evidence of deliberations within the SAO in 2011 and 2012 in order to prove that Valentini fabricated a confession in 1995.  It is a stretch (to say the least) to argue that, if Valentini recommended to SA Alvarez in 2011 that she oppose the motions to vacate or petitions for Certificate of Innocence, he necessarily was attempting to cover up misconduct in 1995 and displaying consciousness of guilt.  One could just as easily speculate that it means Valentini actually witnessed Saunders give a confession and this made it difficult for him to believe he was innocent.

In their reply brief, Plaintiffs rely on an excessive force case, *Davis v. Duran*, 277 F.R.D. 362, 369 (N.D. Ill. 2011), for the proposition that "if a 'faulty investigation was designed to 'cover up' what actually occurred' it 'could be circumstantial evidence of consciousness of guilt.'"  (Doc. 172, at 5).  But Plaintiffs do not identify any deficiency in the reinvestigation much less attribute this to Valentini.  Indeed, they argue that the reinvestigation involved "interviewing various witnesses, ordering additional forensic testing, reanalyzing old evidence, and developing additional evidence" and this resulted in "striking evidence of innocence[.]" (Doc. 160 at 4).  In addition, the *Davis* court ultimately barred testimony about the alleged faulty investigation because the testimony "would hopelessly and irretrievably deflect the jury's attention from the pivotal question of whether Officer Duran acted appropriately given the circumstances with which he was confronted to the irrelevant inquiry of the adequacy of the post-shooting investigation. And that in turn would lead to an exploration of the reasons for the perceived deficiencies...."  277 F.R.D. at 369.  In any event,  Plaintiffs are not foreclosed

from questioning Valentini about his actions during the reinvestigation as long as they do not seek to learn the content of the deliberations surrounding the prosecutorial decisions.

> **3.    Conflict of Interest:** Plaintiffs also assert that Valentini should never have been allowed to participate in the reinvestigation and decision-making process since he had a conflict of interest given his role in taking confessions in 1995.  They argue that they need to question Valentini about his own actions and knowledge and should not be foreclosed from doing so merely because the SAO failed to wall him off from the deliberations.  But Valentini *is* required to respond to questions about his own actions and knowledge regarding the events in 1995.  He is also required to answer questions about his actions in connection with the reinvestigation.  The only questions to which he may invoke the deliberative process privilege are ones seeking to learn the deliberations surrounding the prosecutorial decisions in 2011 and 2012, even if Plaintiffs attempt to learn this indirectly by asking Valentini about his own analysis of the evidence.

It is unfortunate that Valentini was not walled off from the reinvestigation and deliberations in 2010-2011.  It is equally unfortunate that Saunders' counsel did not alert SA Alvarez to the allegation that Valentini had fabricated Saunders' confession.  This allegation was not at all apparent prior to the filing of the lawsuit in November 2012.  The Innocence Project letter in August 2010 stated that Valentini interviewed Saunders in 1995 along with Youth Officer Bowen and Detective Paladino.  It also said Saunders gave an oral statement that Valentini memorialized. (Doc. 176-3 at 9-10).  Neither that letter nor the subsequent amended motion to vacate the convictions alleged that

Valentini engaged in any misconduct. Instead, these documents highlighted the alleged wrongdoing of the police officers in coercing confessions from Plaintiffs, Swift and Fincher.

Regardless, SA Alvarez (not Valentini) is the one who made the prosecutorial decisions, and she did so after a full reinvestigation and with input from a number of her staff. She is entitled to invoke the deliberative process privilege to avoid disclosure of the deliberations surrounding the prosecutorial decisions that she made. Plaintiffs suggest that they merely seek to learn what was in Valentini's own mind and his personal beliefs, opinions and analysis but this is belied by the candid statements of Saunders' counsel. (See Doc. 178, Tr. of 3/10/15, at 21-22, 33) ("[One of the main reasons they opposed it here and didn't oppose it in Dixmoor is … to protect Fabio Valentini…."; "Getting to the truth and how these decisions were made would be extremely important to our client...."). Moreover, it is unclear what possible relevancy Valentini's personal opinions, beliefs and analysis even have if divorced from the deliberations. Certainly Plaintiffs could not argue that he engaged in a coverup demonstrating consciousness of guilt for conduct sixteen years earlier if he kept his opinions and beliefs in 2011 and 2012 to himself. For all of these reasons, the Court declines to find based on the conflict of interest that Plaintiffs have a particularized need for evidence of the deliberations.

**4.** **Seriousness of the Litigation and Chilling Effect:** This litigation and the issues in it are undeniably serious for all of the parties. At the same time, the Court believes that disclosure of information regarding the SAO's deliberations would have a chilling effect on the office's ability to engage in candid, robust discussions about post-

conviction petitions and claims of innocence. Allowing Plaintiffs to have access to such evidence "would set a precedent for others similarly situated to seek discovery of the [SAO's] confidential information and allow them to have full access to closed session discussions as fodder for potential [civil rights] claims." *Tumas v. Board of Educ. of Lyons Tp. High Sch. Dist. No. 204, Cook County, Ill.*, No. 06 C 1943, 2007 WL 2228695, at *7 (N.D. Ill. July 31, 2007). This, in turn, would have a negative impact on the quality of prosecutorial decisions made by the State's Attorney and his or her staff. As the Supreme Court has observed, the privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Klamath Water Users Protective Ass'n*, 532 U.S. at 8-9.

In sum and balancing all the factors together, Plaintiffs have not demonstrated a particularized need for discovery of the SAO's deliberations sufficient to overcome the deliberative process privilege.

**F.    Remaining Deposition Time**

Counsel for Saunders reserved one hour of the allotted 10 hours for deposing Valentini, and Plaintiffs have requested an additional two hours on top of that. Valentini objects that Plaintiffs should receive no more than one more hour for their questioning. Since Plaintiffs will be receiving additional documents following this ruling and this Court overruled some of the privilege objections, the Court will allow two hours for the completion of the deposition within the parameters set forth in this opinion. This should be more than sufficient time.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion to Reopen the Deposition of Fabio Valentini, and to Compel Documents from Valentini and the Cook County State's Attorney's Office (Doc. 160) is granted in part and denied in part.

ENTER:

Dated: August 12, 2015

SHEILA FINNEGAN
United States Magistrate Judge