## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL SAUNDERS, | ) | |
|        Plaintiff, | ) | No. 12-cv-09158 |
| v. | ) | |
| | ) | Hon. Robert M. Dow, Jr. |
| CITY OF CHICAGO, *et al.* | ) | Magistrate Judge Sheila Finnegan |
| | ) | |
|        Defendants. | ) | |

| | | |
|---|---|---|
| VINCENT THAMES, | ) | |
|        Plaintiff, | ) | No. 12-cv-09170 |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et al.* | ) | Hon. Robert M. Dow, Jr. |
| | ) | Magistrate Judge Sheila Finnegan |
|        Defendants. | ) | |

| | | |
|---|---|---|
| HAROLD RICHARDSON, | ) | |
|        Plaintiff, | ) | No. 12-cv-09184 |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et al.* | ) | Hon. Robert M. Dow, Jr. |
| | ) | Magistrate Judge Sheila Finnegan |
|        Defendants. | ) | |

### PLAINTIFFS MICHAEL SAUNDERS, VINCENT THAMES, AND HAROLD RICHARDSON'S JOINT MOTION TO COMPEL THE MPTS DATABASE FROM THE CITY OF CHICAGO

NOW COME Plaintiffs Michael Saunders, Harold Richardson, and Vincent Thames, by and through their respective counsel, who respectfully submit this Motion to Compel the MPTS Database from Defendant City of Chicago.

Given briefing on Plaintiffs' previous Motion to Compel Documents from the City of Chicago, it is well-known to this Court that, during the 1990s, the Chicago Police Department compiled information in a database (the "MPTS database") about violent crimes committed against women who engaged in prostitution and drug use in order to identify patterns among

1

those crimes; that a task force of officers from different CPD Areas worked together using this database as a resource to identify serial killers who were responsible for the different patterns of murders; that the same cases included in the database and investigated by the task force were classified as "ViCAP" cases and reported to the FBI; and that the database included information about both Nina Glover and Johnny Douglas, who was identified in 2011 as the source of the semen on Ms. Glover's vaginal swab. *See Saunders* Dkt. No. 202 (Plaintiff's Motion to Compel); No. 241 (Order on Motion to Compel).

At the time of the prior briefing and this Court's decision, however, the City of Chicago represented that it had searched for, but could not find, the database. This Court accepted those representations, but ordered the City to search for records related to the database that Plaintiffs had requested but it appeared the City had not yet looked for. *See* Dkt. No. 241 at 24-25. As for the database itself, this Court noted, "it would not be burdensome to produce the database if it could be located. Indeed, the City has not objected to producing the database despite believing it to be irrelevant to Plaintiffs' claims. Rather, the City insists that the database has been irretrievably lost or destroyed based on extensive and unsuccessful efforts to find it, and that further discovery is unwarranted." *Id.* at 21.

A copy of the database, as it existed in the Spring of 1998, has finally been obtained.[1] It is one database containing 293 case records. Despite their earlier concession that the database would be produced if located, the City now objects to producing all but eight of the 293 entries

---

[1] After this Court ordered the City to produce documents related to the database, the City then produced a data-entry guide to the database, which it represented had recently been obtained from Sgt. Ridges. (These documents were apparently in the possession of Ridges for years but had not been produced, despite the fact that the City represented Ridges at a deposition nearly a year earlier and was aware of Plaintiffs' discovery requests and the likelihood Ridges would have responsive information.) That data-entry guide listed the name of an officer who helped to create the database—Luby Novitovic. Plaintiffs then asked Defendants to provide information about Mr. Novitovic in order to schedule his deposition. In response, the City informed Plaintiffs that it had contacted Mr. Novitovic and that he had a copy of the database in his possession.

2

in the database. It argues that (1) non-Glover and non-Douglas cases are irrelevant, and (2) law-enforcement privilege applies to 39 cases in the database that are still open and unsolved, and 5 cases that are not from the CPD. The City proposes that rather than producing the database as it exists, it will alter a copy of the database by stripping it of nearly all data and producing entries only for the Glover homicide and seven crimes associated with Douglas.[2] The parties have discussed these issues and are at impasse. *See* Exhibit A (letter from Russell Ainsworth); Exhibit B (letter from Jeff Given). Plaintiffs thus seek this Court's intervention.

Neither of the City's objections have merit, nor do they justify the extreme alteration of the database proposed by the City. There is no burden to producing the database as-is; the City admits there is none. And to the extent the City has any legitimate concern that information from decades old cases in the database should not be made public (information the City permitted a retired CPD officer to keep in his possession and post unsecured to the "cloud"), those concerns can be easily addressed by a protective order. In short, the City's objections do not come close to providing a basis to withhold this readily available information from Plaintiffs. The very fact that the City proposes taking the extreme step of deleting hundreds of entries from the database, rather than simply producing it intact, as it exists, reveals that its real concern is that those entries will actually be useful for Plaintiffs; otherwise, there is no harm in producing them. The database should be produced in full, in the condition it was found.

> **A. The full database is relevant to Plaintiffs' claims that Defendants had, and failed to disclose, evidence favorable to Plaintiffs—that Nina Glover's homicide was part of a pattern of other crimes, including crimes committed by Johnny Douglas.**

"The federal discovery rules are liberal in order to assist in trial preparation and

---

[2] Plaintiffs' understanding is that the City would take steps to delete this data on a copy of the database produced to Plaintiffs, not that the City would permanently delete data from the database. If the City proposes the latter, Plaintiffs strenuously object to the destruction of evidence and ask the Court to enter a preservation order.

settlement." *Cannon v. Burge*, No. 05 C 2192, 2010 WL 3714991, at *1 (N.D. Ill. Sept. 14, 2010). "In ruling on motions to compel discovery, courts have consistently adopted a liberal interpretation of the discovery rules." *SRAM, LLC v. Hayes Bicycle Grp., Inc.*, No. 12 C 3629, 2013 WL 6490252, at *2 (N.D. Ill. Dec. 10, 2013) (quoting *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006) (citation omitted)) "Courts commonly look unfavorably upon significant restrictions placed upon the discovery process" and the "burden rests upon the objecting party to show why a particular discovery request is improper." *Id.*

The burden on a party objecting to disclosure on the basis of relevance alone, as Defendants do here for the majority of the database, is even higher. Even at the time of trial "[a] party faces a significant obstacle in arguing that evidence should be barred because it is not relevant, given that the Supreme Court has stated that there is a 'low threshold' for establishing that evidence is relevant." *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012) (quoting *Tennard v. Dretke,* 542 U.S. 274, 285 (2004)). To be relevant, "evidence need only have 'any tendency to make a fact more or less probable.'" *City of Joliet v. Mid-City Nat. Bank of Chicago*, No. 05 C 6746, 2012 WL 5463792, at *9 (N.D. Ill. Nov. 5, 2012) (quoting Fed. R. Evid. 401).[3] "The question is not whether the evidence has great probative weight, but whether it has any, and whether it in some degree advances the inquiry." *Id.* at *3 (quoting *Davis v. Duran,* 276 F.R.D.

---

[3] Defendants have raised no objection on the basis of proportionality under Fed. R. Civ. P. 26(b)(1). Indeed, Defendants agree it would *not* be burdensome to produce the database. Even if Defendants raise this objection, however, an analysis of Rule 26(b)(1)'s proportionality factors only strengthens Plaintiffs' position that the database should be disclosed: the "importance of the issues at stake in the action," whether officers fabricated evidence against five innocent teens leading to the wrongful convictions of plaintiffs, could not be higher; "the amount in controversy" is tens of millions of dollars; "the parties' relative access to relevant information" favors disclosure as only the City has access to the full database; "the parties' resources" favors disclosure, as the City has ample resources to disclose the database (and in any case, no additional resources will be expended by disclosing it as-is; additional resources are only required to delete information from the database); "the importance of the discovery in resolving the issues," favors disclosure given the relevance of the database to Plaintiffs' claims, and "whether the burden or expense of the proposed discovery outweighs its likely benefit" favors disclosure, as there is no burden or expense to full disclosure (there is instead burden and expense associated with stripping entries from the database).

4

227, 230 (N.D. Ill. 2011)); *see also Brandt v. Charter Airlines, LLC*, No. 14 C 5102, 2015 WL 4764145, at *3 (N.D. Ill. Aug. 12, 2015) ("The bar for relevance is low.").

Defendants cannot meet their burden to justify that the full database has no relevance. The standard governing discovery is not whether the database alone will prove plaintiff's claims, or even whether the database will ultimately be admissible at trial. *See* Fed. R. Civ. P. 26(b)(1) ("Information within this scope of discovery need not be admissible in evidence to be discoverable."). Those questions are for a later day: Defendants can challenge the relevance and admissibility of the database at summary judgment and trial.

At this stage, however, the database is plainly relevant. Its very purpose was to help officers make connections among crimes. The full database shows the scope and characteristics of the pattern of rapes and murders against prostitutes that were known to the CPD before and after the Glover rape/murder. This was the same pattern that the CPD determined the Glover case fit, as did crimes committed by Johnny Douglas. The only way to fully explore what inclusion in the database meant, and what kind of connections between cases the database could have helped officers make, supporting Plaintiffs' claims that they *did* make those connections, is to examine the full database.

Furthermore, Plaintiffs' claims are far from speculative. There is already significant evidence that Defendant Officers were aware of information undermining the case against Plaintiffs and instead implicating Johnny Douglas in the Nina Glover homicide—including that Johnny Douglas, who was at the scene when Ms. Glover's body was found, had a violent criminal history and was believed to have a modus operandi of committing strangulation-murders just like the Nina Glover murder. There should be no dispute that, if Defendant Officers

had this information but buried it, it is relevant to Plaintiffs' *Brady* claims.[4]

In addition, Defendants concede that if they had information pointing to Johnny Douglas that they failed to investigate further, this could demonstrate that they failed to conduct a reasonable investigation. But they are wrong when they claim that failure is irrelevant to Plaintiffs' claims. As Courts have recognized, the failure to conduct obvious investigation that could have led officers to the real-perpetrators is relevant to show bad faith, intentional misconduct, and malice. *See, e.g.*, *Newsome v. McCabe*, No. 96 C 7680, 2002 WL 548725, at *5 (N.D. Ill. Apr. 4, 2002), *aff'd*, 319 F.3d 301 (7th Cir. 2003) (admitting evidence of true perpetrator in wrongful conviction § 1983 trial, explaining that the fact that police did not investigate further and explore likely alternate suspects, which would have led them to the true perpetrator, "could be considered by the jury in determining whether the defendants intentionally manipulated eyewitness identifications in order to close a case").

Specifically, police reports produced to-date provide evidence that Defendants were aware of information implicating Johnny Douglas and either buried it or willfully failed to investigate it because they had already coerced and fabricated statements from Plaintiffs. Beginning in at least December 1997 (around the time Plaintiffs were going to trial), Chicago Police officers working on the task force associated with the MPTS database connected Johnny Douglas to the strangulation-murders of two other women—Gytonne Marsh and Elaine Martin—which were similar to the strangulation-murder of Nina Glover. By that time, Douglas had also been arrested for several other violent assaults of women who, like Glover, Marsh, and Martin, at

---

[4] Had Plaintiffs been made aware of the existence of another suspected serial killer of prostitutes—especially someone who was present at the scene—they could have compared Johnny Douglas to the unknown profile on Glover's vaginal swab, just as they did with suspected serial killer Hubert Geralds. The results of that testing would have shown in 1997 or 1998, if not earlier, that Douglas was the source of the DNA on the Glover vaginal swab, saving Plaintiffs the next 14 to 15 years of their wrongful incarcerations.

times engaged in prostitution in exchange for cocaine.[5] In March 1998, DNA testing confirmed that Douglas's semen was present on the vaginal swabs collected from Gytonne Marsh at autopsy. And on April 1, 1998, Douglas confessed to the murder in a statement witnessed by Defendant Officer Cassidy, and subsequently pleaded guilty. Less than four weeks after taking Douglas's confession, Cassidy then testified as the opening witness at Plaintiff Swift's trial, recounting his search of the scene where Nina Glover's body was found—the same scene at which Cassidy's own police report documents Johnny Douglas's presence.

The MPTS database —critically, a copy of the database as it exists precisely at this moment in time, March of 1998—provides additional evidence that Defendant Officers could make a connection between Douglas's cases. This strengthens Plaintiffs' claims that Defendant Officers were aware of evidence undermining the case against Plaintiffs and pointing instead to Johnny Douglas. It thus tends to make Defendants' misconduct more likely than not, the very definition of relevance. *See* Fed. R. Evid. 401. That the database provides *additional* information of those claims is no reason to withhold it. *See Old Chief v. United States*, 519 U.S. 172, 179 (1997) ("Nor [is] evidentiary relevance under Rule 401 affected by the availability of alternative proofs . . . ."); *Huddleston v. United States*, 485 U.S. 681, 691 (1988) ("[I]ndividual pieces of evidence insufficient in themselves to prove a point may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.").

Here are just a few specific ways that the database is clearly relevant:

---

[5] At the time Nina Glover's body was found, and the police interviewed Johnny Douglas at the scene, Douglas had already acquired a lengthy criminal history, including four prior arrests for physically and sexually assaulting women who engaged in prostitution, including attempting to choke them. Indeed, the CPD circulated a daily bulletin in October 1993 informing officers that a stop-order was in effect because Johnny Douglas was "wanted for aggravated criminal sexual assault." Douglas was convicted of aggravated sexual assault in one of these cases; at the time of Nina Glover's homicide, he had recently been released from prison for that crime.

7

- **The full database will provide additional proof that Defendant Officers were aware of the database**. Although the City has repeatedly stated that there is no evidence connecting the Defendant Officers to the database, that is incorrect. The data-guide recently produced by the City about the database shows that it was "distributed to the detective areas" to be used by others. Ex. C (CITY 16175). Sgt. Ridges' affidavit also suggests that, after the summer of 1995 when a task force was established to work on unsolved prostitute murders, knowledge of his work and the database became widespread. *See* D.E. 236-5 ¶ 22. This is corroborated by news reports, which publicized the fact the task force was established around summer of 1995 and that the database was used to examine patterns among the many prostitute murders. *See, e.g.*, Jim Casey, *Solving Riddle of Serial Killings: Doubts Remain Despite Arrest in Englewood*, Chi. Sun Times, June 25, 1995, attached as Ex. D.

In addition to evidence of widespread knowledge about the database and task force, there is specific evidence that officers would be aware of it given publication of the related ViCAP program. Based on Sgt. Ridges' deposition testimony, his sharing of information with the FBI's ViCAP program was basically limited to the prostitute cases in the database. *See* Ridges Dep. at 48. Any ViCAP case was clearly marked as a ViCAP case with a blue placard in the case file, and information about the ViCAP program was broadcast to all detectives, instructing them to send copies of case reports to Sgt. Ridges. *See* Ex. E (CITY 16166-67). Recent documents produced by the FBI show that Defendant Cassidy was the officer asked to provide a ViCAP form for the Glover case in July and August 1995. *See* Ex. F(CITY 16415-44).

A jury could find that it was more likely than not that Defendant officers would have been aware of the database based on this evidence, especially given the fact that Glover's casefile was visibly marked as a ViCAP case.

The full database will show how many other cases are in the database that Defendants investigated. The more cases in the database with Defendants' involvement, the more likely it is that those officers would be aware of the database, either by having conversations with Sgt. Ridges or other task force investigators using the database (who would have gone back to the officers for information about the case to input in the database or copies of reports). Indeed, the more cases that other Defendant officers had that were, like the Glover case, in the database and marked with a blue ViCAP placard, the more likely they are to be aware of ViCAP, the task force, and the database—and the less credible the jury will find their denials of any knowledge.[6]

Put differently, examination of the entire database is relevant to the Defendant Officers' state of mind at the time they investigated the Nina Glover

---

[6] Defendant Cassidy has already acknowledged that he may have used a database. When asked about his knowledge of databases used to track crime patterns in the 1990s, he testified that he had no recollection of other systems beyond written materials posted on a board at Area 1, but acknowledged "[t]here could have been" other systems and "if there was one, I may have used it." Cassidy Dep. at 59.

homicide and interrogated Plaintiffs, and later testified at hearings and at trial against Plaintiffs. Such information, like training records and other background information, is certainly discoverable. *Cf. Woodward v. Correctional Med. Servs. Of Ill.*, 368 F.3d 917, 930 (7th Cir. 2004) (defendants deviation from its own practices and policies was "relevant circumstantial evidence to show … knowledge and state of mind"); *Brooks v. City of Chicago*, No. 13 cv 3090, 2015 WL 354386, at *6 (N.D. Ill. June 5, 2015) ("Defendants' knowledge and familiarity with police department guidelines… is relevant to their state of mind.).

- **The full database will reveal the level of ongoing investigation in cases even after they had been marked "closed," rebutting Defendants' position that the database could not have facilitated a connection between Douglas and Glover once the confessions were coerced and fabricated from Plaintiffs.** In the City's prior objection to Plaintiffs' motion, the City noted that the database could not have helped connect Douglas to the Glover case because by the time Douglas was added to the database the Glover case was already marked as closed (due to Plaintiffs' coerced and fabricated confessions). *See Saunders* Dkt. No. 236 at 3. The City specifically relied on an affidavit of Sgt. Ridges, in which Ridges affirmed he was "confident that after March 1995 and until my retirement in January 2003, no other information about the Glover case would have been entered into the prostitute murder database, the MPTS database, or the ViCAP system because the Glover case was cleared/closed." Dkt. No. 236-5 (Ridges Affidavit) at ¶ 20 & 25.

From Plaintiffs' limited viewing of the database, during which the Defendants showed Plaintiffs the entries associated with Nina Glover, it is clear that these representations are not accurate. An entry was made in a free-text memo field in the Nina Glover database pages reflecting the fact that in 1997, DNA testing excluded Plaintiffs. In addition, contemporaneous news reports about the prostitute task force note that their review included taking a look at previously closed cases. *See* John Kass, *Top Cop Defends Englewood Probe*, Chi. Tribune, June 23, 1995 ("Rodriguez said that a task force of Wentworth Area detectives has been researching old homicide cases, some of which have been solved, to see if there is a pattern to the killings. Most of the victims were strangled, some were shot or stabbed, and evidence, including semen, has been sent to the FBI for DNA testing."), attached as Exhibit G.

Only the full database will show the extent to which officers continued to investigate cases and had ongoing involvement in cases after they were marked as "closed," supporting Plaintiffs' claims that in 1997 and 1998, as the link between Johnny Douglas and other murders was solidifying due to the work of the task force using the database, the fact that the Glover case was marked as closed would not have prevented them from connecting it with Douglas.

9

- **Only the full database will show what information Defendant Officers would have learned from the database, or could easily have learned if they had not willfully chosen not to investigate.** Although the City has repeatedly attempted to describe the database as rudimentary and incapable of making connections between cases, the documents produced to-date and Plaintiffs' limited viewing of the database shows that is not the case. Plaintiffs of course do not allege that the database, on its own, made connections between cases. But the database—consistent with its purpose as a tool to help officers facilitate making connections between cases—served as a repository of information, allowing data about crimes to be labeled and organized. This then allowed users of the database to search the database for all cases matching those data points, facilitating connections among cases. *See* Ex. C (CITY 16175, describing purpose of MPTS including to "[r]eview numbers of cases quickly", "[f]ind similarities in case profiles" and "[s]earch for duplication and patterns . . .").

    One search, for example, that could have occurred would be a search of the parameters matching what we know to be Johnny Douglas's M.O. (and the facts of the Nina Glover murder): weapon used: hands; injury type: strangulation; arrest record of victim: yes; vaginal swab: yes [for positive for semen]); Cocaine: yes or Benz: yes [showing victim's blood was positive for cocaine]).[7]

    Given that these parameters match what we know about both the Glover case and Douglas's other murder cases (Marsh and Martin), it is likely that this or similar searches would return those cases. But the probative value of any search depends on how many other results are returned. If a search returns results including Glover and a Douglas case and only 5 or 10 other cases, it is more likely that officers would make a connection between Glover and Douglas. If, instead, the search returned 250 cases, the connection between Glover and Douglas would be more attenuated, hidden among many other cases, and it may be less likely a connection between them would be made.

    If Plaintiffs, using the City's proposal of a stripped database, tried to argue that a search for X would return Y, Defendants would easily be able to object that those search results are not accurate because the database had many other cases. The full database must be produced in order for Plaintiffs to perform searches within it and show, accurately, what searches return.

- **Only the full database will show how certain cases labeled as having the same M.O. as Douglas were identified.** Indeed, we know that some type of search was run in order to pull together the cases that are labeled as matching Douglas's M.O. *See* Saunders Dkt. No. 218-10 (screen shots of 13 cases in MPTS database produced by SAO from its Elaine Martin file).[8] Only the full database will allow Plaintiffs to determine how those cases were generated, and reveal what factors were used to determine they matched Douglas's M.O., shedding light on what was understood to be Douglas's M.O. and how the database facilitated

---

[7] See Exhibit C at 16180-85 (listing data fields).
[8] Plaintiffs note that these thirteen cases would, under the City's proposal, be deleted from the database.

10

connection-making among cases in general and specifically for Douglas.

- **Evidence of the database's connection-facilitating will likely be present in the "memo" fields in other cases.** In the Douglas-related entries that Plaintiffs were shown by the City, officers had entered notes into the cases that indicated the officers suspected Douglas of many other crimes, even before Douglas was actually listed as a known offender or suspect in the "offender" page of that case. Similar notes are likely to exist in other cases, shedding light on how the database facilitated connections among cases. The best evidence of how the database worked, and how it helped to facilitate officers making connections between cases, is the database itself.

    A full and complete picture of how the database operated and what data was contained within it will also allow Plaintiffs to question Officer Danzl at his deposition and reveal exactly how the connections were made among Douglas's cases, and how the database facilitated them. Officer Danzl may be a hostile witness,[9] and Plaintiffs should be allowed to question him with actual evidence of how the database operated and all of the information it contained, rather than rely on hypotheticals.

- **The full database is necessary to understand what type of profile CPD assigned to the Nina Glover case**. The database contains a "category" field, and based on the data-entry guide produced by the City, cases within the database should be categorized as "A," "B", and "C", depending on how close they fit a given profile. *See* Ex. C at CITY 16179. (To determine whether this is in fact the case, of course, requires analyzing the full database itself.) In order to understand what these categories mean, and what type of case the Nina Glover homicide was categorized into, requires comparing the Glover case with other cases of that category. Given what we already know about the database—that it collected similar crimes in an attempt to identify serial killers—the profile assigned to the Glover case is very likely to be inconsistent with the theory of the crime Plaintiffs were accused of committing (a drug-debt motivated gang rape and murder) and instead implicated a serial killer, like Douglas.

- **The full database is necessary to ensure that all information about Johnny Douglas, the crimes Johnny Douglas committed, the crimes Johnny Douglas was suspected of committing, and the Nina Glover homicide, are produced.** The City has proposed producing on those cases in which Nina Glover is listed as a victim, and known victims of Johnny Douglas are listed as a victim. For one of those cases, Elaine Martin, Johnny Douglas had not yet been inputted into the database as an offender associated with the case (because DNA testing in that case had not yet been completed). But free-form "memo" fields in that and other

---

[9] Officer Danzl himself has previously been sued for police misconduct and accused of coercing confessions. *See, e.g.*, Jason Meisner, *Commission Finds Evidence of Police Torture in 5 Convictions*, Chicago Tribune, July 26, 2013, http://articles.chicagotribune.com/2013-07-26/news/ct-met-burge-torture-20130726_1_police-torture-illinois-torture-inquiry-torture-commission.

cases noted that Douglas was a suspect in all of those cases, including Martin.

There may be additional mentions of Douglas (or Glover, or any of the Plaintiffs) in these free-form "memo" or "notes" fields in the database. Or the database could refer to Douglas using one of his many aliases, or may have spelled his name using a slightly different variation. Plaintiffs should be allowed to inspect the entire database to ensure that all information about Douglas and Glover is produced.

- **The database may include impeachment evidence for the Defendant officers and other CPD Witnesses.** As noted above, some entries Plaintiffs have already seen in the database contradict assertions in Sgt. Ridges' affidavit. There may be additional information in the full database that impeaches Defendant Officers or other CPD witnesses.

The City's proposal to modify the database by first *deleting* nearly all of the 293 entries in the database and producing only eight entries in the database would strip the database of its probative value. The database would no longer exist in the form it existed in March 1998. Plaintiffs would not be able to show what kind of information the database gave Defendants in response to searches of the database. Nor could Plaintiffs learn, based on the associations and categorization between other cases and Glover, that it is more likely that the officers were aware that the facts of the Glover case were inconsistent with Plaintiffs' prosecution and instead consistent with a serial killer like Johnny Douglas. Altering the database would also violate the directives of the federal rules governing discovery: that a "party must produce documents as they are kept in the usual course of business" and "in a form or forms in which it is ordinarily maintained . . . ." Fed. R. Civ. P. 34

To the extent some information in the database is ultimately not, as the evidence currently suggests it should be, useful or particularly probative of Plaintiffs' claims, then it will not become a part of this case. Or, if there is a dispute between the parties about relevance, Defendants can seek to exclude any evidence through *in limine* motions. But there is no harm to disclosure of the full database, nor does the City allege any; the only possible harm to the City in

producing the full database is that it will actually prove useful to Plaintiffs' claims. The City's proposal thus suggests that the real reason it refuses to disclose the database intact is that it is concerned that the additional cases will be helpful to Plaintiffs. Otherwise, it should simply produce it, in the form it was found, rather than taking the time and expense required to delete most of it.

### B. Plaintiffs agree to disclosure of the database pursuant to protective order, mooting any concerns over law enforcement privilege the City raises regarding the 39 open cases and 5 non-CPD cases.

The only other objection the City raises to producing the database is a law-enforcement privilege objection that pertains only to 39 cases that the City has identified are still open and unsolved, and 5 non-CPD cases. But the "party claiming the law enforcement privilege bears the burden of justifying the application of the privilege." *Thayer v. Chiczewski,* No. 07 C 1290, 2009 WL 2192581, at *3 (N.D. Ill. July 20, 2009). "Before the privilege will apply, a responsible official must lodge a formal claim of privilege after actual personal consideration, 'specifying with particularity the information for which protection is sought, and explain why the information falls within the scope of the privilege.'" *Id.* (quoting *Hernandez v. Longini*, 1997 WL 754041, at * 4 (N.D. Ill. Nov. 13, 1997)). The City has not done so.

Even if the City were to meet these requirements, the law enforcement privilege still would not prevent the database's disclosure (or even require deleting these 44 cases from the database). *See Thayer*, 2009 WL 2192581, at *3 (concluding that the law-enforcement privilege does not prevent disclosure).[10] There is no indication that any of the open cases are being

---

[10] Ten factors often examined are the following, which Plaintiffs reserve the right to more fully address in the event the City chooses to properly invoke the law-enforcement privilege. *Thayer*, 2009 WL 2192581, at *3 ("The Court may consider a number of factors in making this determination, including: 1) whether disclosure will thwart governmental process by discouraging citizens from coming forward with information; 2) the impact on those citizens that have come forward with information; 3) the degree to which government self-evaluation and improvement will be chilled; 4) whether the information is factual or evaluative; 5) whether the party seeking discovery faces potential criminal charges; 6) whether the department's investigation is ongoing; 7) whether any

13

actively investigated. To the contrary, they are all nearly twenty years old (having been entered into the database before March 1998), and are likely cold cases that have not been active for over a decade. And the City does not even allege that the 5 cases that are not CPD cases are even still open cases. The City does not describe any concerns related to disclosing these cases that could not be addressed by a protective order. *See Santiago v. City of Chicago*, No. 09 C 3137, 2010 WL 1257780, at *3 (N.D. Ill. Mar. 26, 2010) (ordering even active and ongoing investigative files to be disclosed under protective order because "[t]he law enforcement investigative privilege is overcome in the instant case by Santiago's need for the information and the City's concerns can be addressed by an appropriate protective order").[11]

## CONCLUSION

WHEREFORE Plaintiffs respectfully request that this Court enter an order compelling Defendant City of Chicago to produce the full MPTS database to Plaintiffs, without alteration.

Dated:  May 12, 2016        Respectfully submitted,

| /s/ Alexandra Lampert | /s/ Russell Ainsworth | /s/ Henry Turner, Jr. |
|---|---|---|
| Peter Neufeld | Arthur Loevy | Stuart Chanen |
| Nick Brustin | Jon Loevy | Henry Turner |
| Anna Benvenutti Hoffmann | Russell Ainsworth | Valorem Law Group |
| Alexandra Lampert | Rachel Steinback | 35 East Wacker Dr., Ste. 3000 |
| Danielle Hamilton | David Owens | Chicago, IL  60601 |
| Neufeld Scheck & Brustin LLP | Loevy & Loevy | Phone: (312) 676-5460 |
| 99 Hudson St., 8th Floor | 312 N. May St., Ste. 100 | **Counsel for Vincent Thames**; |
| New York, NY 10013 | Chicago, IL 60607 | Case No. 12-9170 |
| 212.965.9081 | 312.243.5900 | |
| | **Counsel for Harold** | |
| John Benson | **Richardson**; | |
| Law Office of John C. Benson | Case No. 12-9184 | |

---

interdepartment proceedings have or may arise from the investigation; 8) whether the Plaintiffs' suit was brought in good faith and/or lacks merit; 9) whether the discovery sought is available through other means; and 10) the importance of the information sought to the Plaintiffs' case.").

[11] Indeed, a protective order will provide more protection for these open cases in the database than it currently has: it has apparently been in the possession of a retired officer for years, stored in the cloud and accessible via the internet.

4111 S. Richmond
Chicago, IL 60632
312. 399.5419
**Counsel for Michael Saunders**;
Case No. 12-12-9158

## **CERTIFICATE OF SERVICE**

I, Alexandra Lampert, an attorney, certify that on May 12, 2016, a copy of *Plaintiffs Michael Saunders, Vincent Thames, and Harold Richardson's Joint Motion To Compel the MPTS Database from the City Of Chicago* was served upon all counsel of record through the Court's electronic filing system.

/s/ Alexandra Lampert
Alexandra Lampert
Neufeld Scheck & Brustin LLP
99 Hudson St., 8th Floor
New York, NY 10013
212.965.9081