### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL SAUNDERS, | ) | |
| Plaintiff, | ) | No. 12-cv-09158 |
| v. | ) | |
| | ) | Hon. Robert M. Dow, Jr. |
| CITY OF CHICAGO, *et al.* | ) | Magistrate Judge Sheila Finnegan |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| VINCENT THAMES, | ) | |
| Plaintiff, | ) | No. 12-cv-09170 |
| v. | ) | |
| | ) | Hon. Robert M. Dow, Jr. |
| CITY OF CHICAGO, *et al.* | ) | Magistrate Judge Sheila Finnegan |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| HAROLD RICHARDSON, | ) | |
| Plaintiff, | ) | No. 12-cv-09184 |
| v. | ) | |
| | ) | Hon. Robert M. Dow, Jr. |
| CITY OF CHICAGO, *et al.* | ) | Magistrate Judge Sheila Finnegan |
| | ) | |
| Defendants. | ) | |

### OBJECTIONS TO MAGISTRATE JUDGE FINNEGAN'S JULY 25, 2016
### ORDER ON PLAINTIFFS' MOTION TO COMPEL THE "MPTS" DATABASE

**Table of Contents**

INTRODUCTION ........................................................................................................... 4

BACKGROUND ........................................................................................................... 6

    A.    The Relevance of the MPTS Database to Plaintiffs' Wrongful Conviction Claims ........ 6

    B.    The City's Resistance to Producing the Relevant MPTS Database Has Unnecessarily Extended The Length of this Litigation. ........................................................................... 9

ARGUMENT .................................................................................................................. 10

I.    The Full Database is Relevant to Plaintiffs' Federal and State Law Claims. ...................... 10

    A.    The Full Database is Likely to Provide Further Proof that the Defendant Officers Were Aware of the Database's Existence When They Investigated and Prosecuted Plaintiffs for Nina Glover's Murder. ...................................................................................................... 13

    B.    The MPTS Database Will Reveal that Investigation into Prostitute Murder Cases, Like Glover's, Continued After They Had Been Marked "Closed." ................................ 15

    C.    The Full Database Will Show What Information the Defendant Officers Learned or Could Have Learned Had They Not Willfully Refused to Investigate. ............................ 16

    D.    The Full Database Will Show How Cases Were Labeled and Tracked. ......................... 16

    E.    The Full Database May Provide Evidence of Impeachment Against the Defendant Officers and Other CPD Witnesses. .................................................................................. 18

II.    Given the Database's Relevance, a Prohibition on its Production is Contrary to the Law and Restrictions Surrounding its Viewing are Unwarranted. ....................................................... 18

III.    Any Concerns About the Production of a Law Enforcement Database Can Be Addressed by Producing the Database Pursuant to a Protective Order. ...................................................... 23

CONCLUSION .............................................................................................................. 23

## TABLE OF AUTHORITIES

**Cases**

*Alliance to End Repression v. Rochford,*
    75 F.R.D. 441 (N.D. Ill. 1977)............................................................................7

*Beaman v. Souk,*
    7 F. Supp. 3d 805, 821 (C.D. Ill. 2014) ..............................................................8

*Brady v. Maryland,*
    73 U.S. 83 (1963)................................................................................................9

*Brewster v. Shasta Cty.,*
    27 F. App'x 908 (9th Cir. 2001) .......................................................................10

*Brooks v. City of Chicago,*
    No. 13 CV 3090, 2015 WL 3545386 (N.D. Ill. June 5, 2015)..................12, 16

*Cannon v. Burge,*
    No. 05 C 2192, 2010 WL 3714991 (N.D. Ill. Sept. 14, 2010).............................8

*City of Joliet v. Mid-City Nat. Bank of Chicago,*
    No. 05 C 6746, 2012 WL 5463792 (N.D. Ill. Nov. 5, 2012) ............................8

*Covad Commc'ns Co. v. Revonet, Inc.,*
    258 F.R.D. 5 (D.D.C. 2009).............................................................................18

*Dekeyser v. Thyssenkrupp Waupaca, Inc.,*
    No. 08-C-0488, 2015 WL 10937559 (E.D. Wis. April 10, 2015) ....................18

*Doe v. Hudgins,*
    175 F.R.D. 511 (N.D. Ill. 1997).......................................................................16

*Goshawk Dedicated Ltd. V. Am. Viatical Servs., L.L.C.,*
    No. 1:05-CV-2343-RWS, 2007 WL 3492762 (N.D. Ga. Nov. 5, 2007) .............18

*Jones v. Nat'l Council of Young Men's Christian Ass'ns of the U.S.,*
    No. 09 C 6437, 2011 WL 3272868 (N.D. Ill. July 28, 2011) ..........................18

*Hale v. State Farm Mut. Auto. Ins. Co.,*
    No. 12-0660-DRH, 2015 WL 854506 (S.D. Ill. Feb. 26, 2015) .......................16

*NDK Crystal, Inc. v. Nipponkoa Ins. Co., Ltd.,*
    No. 10 C 1824, 2011 WL 43093 (N. D.Ill.2011)................................................8

*Newsome v. McCabe,*
    No. l96 C 7680, 2002 WL 548725 (N.D. Ill. April 4, 2002) ...........................10

*Omax Corp. v. Flow Int'l Corp.,*
    No. C04-2334L, 2007 WL 1830631 (W.D. Wash. June 22, 2007) ........................................18

*Santiago v. City of Chicago,*
    No. 09 C 3137, 2010 WL 1257780 (N.D. Ill. Mar. 26, 2010) ...........................................16, 20

*Sornberger v. City of Knoxville, Ill.,*
    434 F.3d 1006 (7th Cir. 2006) ............................................................................................10

*THK America, Inc. v. NSK Co. Ltd.,*
    157 F.R.D. 637 (N.D. Ill. 1993).............................................................................................8

*United States v. Boros,*
    668 F.3d 901 (7th Cir. 2012) .................................................................................................8

*Weeks v. Samsung Heavy Industries Co., Ltd.,*
    126 F.3d 926 (7th Cir. 1996) .................................................................................................7

*Woodward v. Correctional Med. Servs. of Illinois,*
    368 F.3d 917 (7th Cir. 2004) ...............................................................................................12

**Other Authorities and Rules**

Fed. R. Civ. P. 72(a) ...........................................................................................................1, 6, 7

Rule 26 ........................................................................................................................................3, 8

FED. R. CIV. P. 26(b)(1) .............................................................................................................8

FED. R. CIV. P. 34(b)(2)(E) ....................................................................................................17

Rule 34 .......................................................................................................................................17

John Kass, *Top Cop Defends Englewood Probe,* CHI. TRIB. (June 23, 1995)..............................13

## INTRODUCTION

Plaintiffs Michael Saunders, Harold Richardson and Vincent Thames, by and through their respective counsel and pursuant to Fed. R. Civ. P. 72(a), respectfully submit these objections to Magistrate Judge Finnegan's oral discovery order of July 25th,[1] granting in part and denying in part Plaintiffs' most recent motion to compel the City of Chicago to produce in its entirety the Chicago Police Department's (CPD's) Multi-Purpose Tracking System Database ("MPTS" database). The MPTS database is a stand-alone computer database that CPD used solely to track serial violent crimes committed against women who engaged in prostitution and drug use in the 1990s. The MPTS database contained information about the Nina Glover homicide, for which Plaintiffs were wrongly convicted, as well as crimes committed by Johnny Douglas, the actual perpetrator of the Glover murder. *See* Saunders Dkt. No. 265. There should be no dispute that the full MPTS database is relevant to the litigation, both as to Plaintiffs' due process and malicious prosecution claims, as well as to circumstantial evidence of Plaintiffs' innocence. Nonetheless, the City of Chicago has objected to producing the entire database, of which there are three versions. Indeed, the City has offered to make only a portion of one of the versions available to Plaintiffs.[2]

The intervention of this Court is necessary here. In the July 25th order on Plaintiffs' motion to compel, Magistrate Judge Finnegan required that the City of Chicago produce a

---

[1] A transcript of Magistrate Judge Finnegan's oral ruling of July 25, 2016 is attached as Ex. A. Federal Rule of Civil Procedure 72(a) governs the submission of a party's written objections to a magistrate judge's written order on nondispositive pretrial matters. In accordance with the advisory committee notes on this subsection, an oral order read into the record by the magistrate judge will satisfy the written order requirement.

[2] The City has advised Plaintiffs and the Court that it has in its possession two other versions of the MPTS database with different dates. *See* Saunders Dkt. No. 281 at 2. Plaintiffs here seek the full production of not only the copy of the MPTS database first located by the City but also these different versions for purposes of comparing what information was contained in the database at different times.

"stripped down database containing only information relating to Nina Glover and the seven cases involving Johnny Douglas"; the magistrate judge denied Plaintiffs' motion to compel the production of the entire database. Ex. A at 13. The magistrate judge also required that the City only "grant onsite access [to the full database] to one attorney for each plaintiff. *Id.* at 13-14, holding that if Plaintiffs find "something that they believe to be relevant that they need, that they are going to offer into evidence, they can come back and ask for production of that[.]" *Id.* at 13-14. Magistrate Judge Finnegan left open the question of whether the attorneys who viewed the database could take notes or screenshots of what they saw for purposes of filing further discovery motions, leaving it to the parties to come to an agreement on the issue; the magistrate judge suggested that the parties return to court if no agreement could be reached. *See id*. at 17-21.

For good reasons, district court judges are typically reluctant to overrule magistrate judges' discovery orders. Recognizing that, Plaintiffs would not ordinarily seek review of a discovery order and have yet to do so in the years of discovery in these cases. However, this issue presents a different context.

Plaintiffs' underlying motion to compel stems from a long-lasting dispute with the defendants that has resulted in multiple discovery motions,[3] slowed the close of discovery,[4] and prevented Plaintiffs from fully litigating their claims. The magistrate judge's recent order

---

[3] Plaintiffs' initial motion to compel the database was filed July 16, 2015. *See Saunders* Dkt. No. 202. *See also* Dkt. No. 210-1 (City's Response); Dkt. No. 218 (Plaintiff's Reply); Dkt. No. 224 (Plaintiffs' Supplement to Motion); Dkt. No. 228 (Defendants' Surreply). After the City of Chicago located a copy of the database, on May 12, 2016, Plaintiffs filed the instant motion to compel. *See Saunders* Dkt. No. 265; *see also* Dkt. No. 273 (City's Response); Dkt. No 274 (Plaintiffs' Reply); Dkt. No. 280 (Plaintiffs' Supplement); Dkt. No. 281 (City's Response to Supplement).

[4] Currently, with the exception of an agreed date by which Defendants will produce a rebuttal DNA expert report, there is no scheduling order in place setting expert discovery deadlines, a summary judgment deadline, or trial dates. *See Saunders* Dkt. No. 317 (order granting Defendants' motions to extend expert discovery schedule); Dkt. No. 341 (Plaintiffs' Joint Status Report Regarding Pending Motions).

denying production of the full database hinders the discovery of documents that are clearly relevant and to which Plaintiffs are entitled under Rule 26. Contrary to this order, Plaintiffs are not required to show that the documents in the database will be "offered[ed] into evidence" at trial in order to obtain their production in discovery. Furthermore, the magistrate judge's denial of production is not justified by any burden to the Defendants, investigative privilege or security concerns, and the restrictions on review are unwarranted. Finally, it is likely that disagreements over the scope of the order (*e.g.*, the ability of Plaintiffs' counsel to take notes about and screenshots of the database, and whether additional review will justify the disclosure of more or all of the database) will lead to further litigation, extending yet again a discovery dispute that has been going on much too long already and prevented the completion of other discovery.[5]

In order to finally complete fact discovery, nearly four years after these cases were filed, Plaintiffs seek an order from this court overruling Magistrate Judge Finnegan's order and compelling the City to produce the MPTS database in its entirety.

## BACKGROUND

### A. The Relevance of the MPTS Database to Plaintiffs' Wrongful Conviction Claims

These civil rights cases arise out of the wrongful convictions of Plaintiffs Michael Saunders, Harold Richardson, Vincent Thames, and Terrill Swift,[6] for the rape and murder of Nina Glover. Ms. Glover's body was discovered on November 7, 1994, in a dumpster in the Englewood area of Chicago; she had been sexually assaulted and strangled.

Plaintiffs were wrongly arrested for the Glover homicide as teenagers in March 1995, when the Defendant Officers and two Assistant States Attorneys coerced and fabricated

---

[5] This includes the long-noticed deposition of Officer Danzl who, using the database, linked Johnny Douglas to a string of other strangulation-murders of prostitutes.
[6] Mr. Swift's case is pending in Illinois state court. The parties are coordinating discovery and Mr. Swift's case is set for trial beginning January 17, 2017.

confessions from them. To prove their innocence, Plaintiffs sought pre-trial DNA testing of the vaginal swabs recovered from Glover: the swabs contained only one male DNA profile, and none of the accused teenagers was the source. Despite the strength of those DNA exclusions, however, all four teens were convicted between November 1997 and April 1998 due to the Defendants' misconduct in coercing and fabricating their confessions. They were wrongly imprisoned until 2011, when post-conviction DNA testing revealed the source of the DNA on the Glover vaginal swabs was Douglas.

By November 1994, Johnny Douglas had amassed a lengthy and violent criminal record: he had been arrested multiple times for sexually and physically assaulting women who were engaged in prostitution and/or drug use, like Ms. Glover. At that time, he was living in the basement of the building *immediately adjacent* to the dumpster where Ms. Glover's body was found. And the morning Ms. Glover's body was discovered, Johnny Douglas was present at the scene of the crime and interviewed by officers, but gave a false address miles away and falsely claimed to know nothing.

Furthermore, unknown to Plaintiffs at the time of their prosecution, Douglas was one of several men investigated by the CPD as part of a coordinated investigation into serial killers of prostitutes. Since 1992, the CPD had been tracking crimes against prostitutes that were believed to be the work of one or more serial killers. To identify patterns and serial offenders among those cases, CPD set up a Department-wide task force and kept track of the crimes in a central database. The database was first created by a Sergeant Ridges and over time became known as the "MPTS" database; ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇ *See* MPTS Database Data Entry Instructions (filed under seal as Ex. B) at City 16175-76; *see also* Ex. C, filed under seal. Also unknown to Plaintiffs at the time of their

prosecution, the database included information about the Nina Glover murder as well as information about Johnny Douglas.

At least as of late 1997, the MPTS unit, using the database, connected Douglas to two other strangulation-homicides of women engaged in prostitution, just like the Glover homicide: the June 1995 strangulation murder of Elaine Martin and the April 1997 strangulation murder of Gytonne Marsh. DNA testing of the vaginal swabs in each of those cases matched Douglas. And on April 1, 1998, Douglas gave a detailed confession to the Marsh homicide. He later pleaded guilty to her rape and murder and was sentenced to 20 years in prison.[7]

None of this information was ever disclosed to Plaintiffs during their prosecutions, however, despite the fact that Defendants had access to information about Douglas' other crimes, including through the MPTS database. The failure to disclose information about Douglas is all the more significant given the fact that the same officers involved in the Glover investigation were aware of Douglas's violent crimes and *modus operandi* of strangling women engaged in prostitution: Defendant Cassidy, who was present at the scene where Glover's body was found, signed the police report documenting Douglas's interview at the scene. *See* Ex. D. Cassidy then took Douglas' confession in April 1998 to the Marsh homicide. *See* Ex. E. Just weeks after taking that confession, Cassidy testified at Plaintiff Swift's trial, recounting his investigation at the scene of the Glover homicide, where Douglas had been interviewed. *See* Ex F.[8]

---

[7] While incarcerated for the Marsh homicide, Douglas was tried for the Martin homicide; despite the DNA evidence, he was acquitted at trial. In 2008, shortly after Douglas's release from prison, he was killed by a man acting in self-defense.

[8] As described below, records show that at least two other police officers, Winstead and Foley, were also involved in both the investigation of Plaintiffs for the Glover homicide and the investigation of serial killers of prostitutes, including Johnny Douglas.

**B. The City's Resistance to Producing the Relevant MPTS Database Has Unnecessarily Extended The Length of this Litigation.**

Since discovering the existence of the MPTS database, Plaintiffs have engaged in protracted efforts to obtain a copy,[9] in order to determine (1) what information was included in the database at the time of the Plaintiffs' arrests and criminal trials and (2) what kind of connections the Defendant Officers could have made and *did* make about who was actually responsible for Glover's murder. At this juncture, Plaintiffs have viewed limited entries of the database involving Douglas and Glover at the offices of counsel for the Defendant Officers, and Plaintiff's forensic examiner expert has reviewed the database for the sole purposes of determining what metadata still exists within the database and how deleting information as Defendants requested would impact the metadata. *See* Saunders Dkt. No. 280-1 (report of Wolfgang Wilke). As detailed below, Plaintiffs are entitled to production of the full database to support their *Brady* claims and to show the Defendants' bad faith in their investigation of the

---

[9] Plaintiffs requested production of the database 18 months ago, in January 2015. In response, the City of Chicago objected and then stated it could not locate the database and upon information and belief the database likely no longer existed. In May 2015, Plaintiffs deposed Sgt. Jack Ridges who initially created the database in 1992. In light of his testimony, which described the last known location of the database and other responsive documents, Plaintiffs repeatedly asked the City of Chicago to supplement their prior discovery responses and to take additional steps to locate the database; when the City would not do so, Plaintiffs filed a motion to compel. *See Saunders* Dkt. No. 202. In response, the City argued that the database was not relevant to Plaintiffs' claims but in any case it could not be found. *Id.* at Dkt. No. 210-1; *see also* Dkt. No. 218 (Plaintiff's Reply); Dkt. No. 224 (Plaintiffs' Supplement to Motion); Dkt. No. 228 (Defendants' Surreply).

On January 5, 2016, the court ruled that the City of Chicago had "adequately searched for and detailed its efforts to find the Ridges database" but ordered the City to search for documents describing the database if it had not already done so and to produce those documents. *Saunders* Dkt. No. 241 at 24.

On February 18, 2016, the City subsequently produced documents that had been in the possession of Sgt. Ridges but which were not produced prior to his deposition, including a 1998 data entry guide to the database, which credited an officer—Luby Novitovic—with designing the database. Plaintiffs requested that the City provide information regarding Mr. Novitovic so that he could be deposed. On March 17, 2016, the City then informed Plaintiffs that a copy of the MPTS database had been located by Mr. Novitovic, who was retired and living out of state, at his home. The instant motion to compel then followed. The City did not inform Plaintiffs that any other copies of the database were potentially in the custody or control of Mr. Novitovic until June 9, 2016, when in a supplemental brief the City noted that Mr. Novitovic had located two other copies of the MPTS database in his home in Chicago. *See Saunders* Dkt. No. 281 at 3.

Glover murder and prosecution of the teenagers. Production of a "stripped down" copy of the database will not suffice and neither will a restricted "viewing" of the full database.

## ARGUMENT

Under Federal Rule of Civil Procedure 72(a), this Court should intervene where the magistrate judge's decision was "contrary to law." FED. R. CIV. P. 72(a); *see also Weeks v. Samsung Heavy Industries Co., Ltd.*, 126 F.3d 926, 943 (7th Cir. 1996). Under the federal rules, Plaintiffs are entitled to the full MPTS database as it existed in 1998. Accordingly, the discovery order is contrary to the law in that it imposes unwarranted restrictions on the production of relevant discovery under Rule 26. *See Alliance to End Repression v. Rochford*, 75 F.R.D. 441, 444 (N.D. Ill. 1977) ("This Court notes that the scope of discovery in civil cases is extremely broad. Relevancy objections, while permissible, will not be sustained where discovery sought is relevant to the subject matter."); *THK America, Inc. v. NSK Co. Ltd.*, 157 F.R.D. 637, 641 (N.D. Ill. 1993) (noting that protective order allowing only "sparing" designation of documents as "extremely confidential" was "consistent with the general concepts of federal discovery which are that the federal discovery rules are to be liberally construed and there are to be no unnecessary restrictions on relevant discovery.").

### I.     The Full Database is Relevant to Plaintiffs' Federal and State Law Claims.

"The federal discovery rules are liberal in order to assist in trial preparation and settlement." *Cannon v. Burge*, No. 05 C 2192, 2010 WL 3714991, at *1 (N.D. Ill. Sept. 14, 2010); *see also NDK Crystal, Inc. v. Nipponkoa Ins. Co., Ltd.,* No. 10 C 1824, 2011 WL 43093 n. 3 (N. D.Ill.2011) ("Under the revised version [of the federal rules] . . . a liberal discovery standard still applies."). To be relevant, "evidence need only have 'any tendency to make a fact more or less probable.'" *City of Joliet v. Mid-City Nat. Bank of Chicago*, No. 05 C 6746, 2012

WL 5463792, at *9 (N.D. Ill. Nov. 5, 2012) (quoting FED. R. EVID. 401). Indeed, even at the time of trial "[a] party faces a significant obstacle in arguing that evidence should be barred because it is not relevant, given that the Supreme Court has stated that there is a 'low threshold' for establishing that evidence is relevant." *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012) (quoting *Tennard v. Dretke,* 542 U.S. 274, 285 (2004)). But the discovery phase is not the time to determine admissibility at trial. *See* FED. R. CIV. P. 26(b)(1) ("Information within this scope of discovery need not be admissible in evidence to be discoverable.").

The MPTS database shows the characteristics of the rapes and murders against prostitutes known to CPD officers before and after the Glover rape/murder. Analysis of the full database is necessary to show what inclusion in the database meant, and what kind of connections between the cases the Defendant Officers could have made at the time of the teenagers' arrests and prosecutions, thus supporting Plaintiff's claim that the officers *did* make those connections. Such evidence will bolster facts already in the record indicating the Defendant Officers were aware of evidence implicating Douglas and undermining the case against the Plaintiffs—exculpatory evidence the Defendants did not reveal.

Concealing evidence implicating an alternative perpetrator gives rise to a due process claim pursuant to *Brady v. Maryland*, 73 U.S. 83 (1963), and its progeny. *See Beaman v. Souk*, 7 F. Supp. 3d 805, 821 (C.D. Ill. 2014) ("Evidence suggesting an alternative perpetrator is usually considered exculpatory."). Had Plaintiffs been made aware of Johnny Douglas's violent criminal history, including the fact he was linked by DNA to the strangulation-murders of two other women, they could have presented evidence that he was the true killer. Indeed, they could have even compared Douglas to the unknown profile on Glover's vaginal swab, which would have shown that Douglas was the source of the DNA, preventing the wrongful convictions and

incarcerations at the outset. On the facts of this case, that is not at all speculative: when attorneys for Plaintiffs Saunders and Richardson learned about another man being prosecuted for murdering female prostitutes, they requested and were *permitted* to compare his DNA to the DNA found on Glover's vaginal swab; Saunders and Richardson were only sentenced after the DNA did not match. *See* Ex. G. If Plaintiffs had been aware of Douglas's criminal history, the court would certainly have permitted DNA comparison of him as well, especially in light of the fact he was at the crime scene.

And evidence that the Defendants willfully failed to pursue valuable leads—including viable, alternative perpetrators—supports their malicious prosecution claims by demonstrating bad faith, intentional misconduct, and malice. *See*, *e.g.*, *Newsome v. McCabe*, No. l96 C 7680, 2002 WL 548725, at *5 (N.D. Ill. April 4, 2002), *aff'd* 319 F.3d 301 (7th Cir. 2003) (admitting evidence of true perpetrator in civil wrongful conviction trial, and noting that evidence that police did not explore alternative suspects that could have led to that perpetrator "could be considered by the jury in determining whether the defendants intentionally manipulated eyewitness identifications in order to close a case."); *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1016 (7th Cir. 2006) ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest . . . [and] [r]easonable avenues of investigation must be pursued especially when, as here, it is unclear who committed the crime."); *Brewster v. Shasta Cty.*, 27 F. App'x 908, 914 (9th Cir. 2001) ("[W]hile the failure to obtain DNA tests of the victim's clothing does not implicate an independent clearly established constitutional right, it is further circumstantial evidence of improper motive.").

Beyond what has already been discussed, a full review of the database will also provide the following relevant information in support of Plaintiffs' claims:

**A. The Full Database is Likely to Provide Further Proof that the Defendant Officers Were Aware of the Database's Existence When They Investigated and Prosecuted Plaintiffs for Nina Glover's Murder.**

The MPTS was created in response to a problem plaguing law enforcement in the mid- to late-1990s in Chicago, namely, ███████████████████████████████████████████ ████████████████████████████████████████████████." Ex. B at City 16175. The purpose of the MPTS was ███████████████████████████████████████ ███████████████████████████████████████████ *Id*. at City 16176. Evidence in the record suggests that detectives throughout the City knew about this database. ████████████████████████████, ██████████████████████ ███████████████████████████████ Ex. B at 16175. Sergeant Ridges, who created the original database, attested that the database operated in conjunction with a task force created in 1995 to work on unsolved prostitute murders; he suggested that the creation of the task force spurred more widespread knowledge in CPD of his work identifying patterns in crime. *See* Ex. H at ¶ 22. At that time, detectives who wanted to access the database to use in connection with an investigation would contact Ridges directly. As Ridges affirmed, the database "collected information about many cases into one location so that the information could be searched and compared in an effort to make spatial, temporal and other connections that might not be made if cases were looked at in isolation." *Id*. at ¶ 23.

In addition to showing evidence of knowledge about the database and task force within CPD more generally, the record suggests that individual defendants had personal dealings with MPTS. As part of the effort to investigate pattern crimes, the CPD contributed information to "ViCAP" (the FBI's Violent Criminal Apprehension Program), and Ridges testified that the use of ViCAP was basically limited to sharing information about cases in the MPTS database.

Magistrate Judge Finnegan's January 5, 2016 Order on Plaintiffs' Motion to Compel (Saunders

Dkt. No. 241) at 12-13; Ridges Dep. (excerpts attached as Ex. I) at 48.[10] Documents produced by

the FBI show ████████████████████████████████████████████████████████

████████████████████████████████████████████████. *See* Ex. J, filed under seal.

Defendant Cassidy's partner of 15 years, Detective Edward Schmidt, was asked about

computerized databases and testified at his deposition that he believed he would have gone to

Sgt. Ridges for reports about other cases because "I remember him talking about prostitute

murders . . . . He would ask me if I was working on any prostitute murders or if I had cleared any

prostitute murders." Schmidt Dep. (excerpts attached as Ex. K) at 122–24. Schmidt knew of no

reason why Ridges would have only come to him and not also to other detectives. *Id.* at 153; *see*

*also id.* at 148, 155–56. And police reports produced to-date from CPD's investigation of Johnny

Douglas's other murders show that it was the MPTS unit involved in those investigations; three

detectives involved in the Glover investigation, including Defendant Cassidy, participated in

those as well. *See* Group Ex. L.

Review of the entire database will show how many other cases are in the database that the

Defendant Officers investigated. The more cases in the database showing the Defendants'

involvement, the more likely it is that those officers were aware of the database and personally

used it in investigations, and the less credible a jury would find their denials of knowledge about

the database. In other words, examination of the full database is relevant to the Defendants' state

of mind at the time they investigated and assisted in prosecuting the Glover case. Such evidence

is certainly discoverable. *Cf. Woodward v. Correctional Med. Servs. of Illinois*, 368 F.3d 917,

930 (7th Cir. 2004) (defendant's deviation from its own practices and policies was "relevant

---

[10] ████████████████████████████████████████████████████████████

████████████. *See* Ex. M, filed under seal, at City 16166-67.

14

circumstantial evidence to show…knowledge and state of mind"); *Brooks v. City of Chicago*, No. 13 CV 3090, 2015 WL 3545386, at *6 (N.D. Ill. June 5, 2015) ("Defendants' knowledge and familiarity with police department guidelines…is relevant to their state of mind[.]").

**B. The MPTS Database Will Reveal that Investigation into Prostitute Murder Cases, Like Glover's, Continued Even After They Had Been Marked "Closed."**

Plaintiffs allege that the Defendant Officers knew about Douglas prior to and during the prosecution of the Plaintiffs and disregarded this evidence in order to ensure Plaintiffs' convictions. The City of Chicago has contended in a prior filing (*see* Saunders Dkt. No. 236 at 3) that the database could not have assisted in connecting Douglas to the Glover murder because Douglas was added to the database after the Glover homicide was closed. The City has relied on Ridges' affidavit to support this position. *See* Ex. H at ¶¶ 20, 25.

However, review of what limited discovery on this issue does exist suggests that Ridges' representations are inaccurate. ███████████████████████████████████████ ██████, ████████████████████████████████████████ ██████████████████████.[11] ███████████████████████████████████ ██████████████████████████████ Further, contemporaneous news reports about the prostitute task force note that their work included examining previously closed cases. *See* John Kass, *Top Cop Defends Englewood Probe*, CHI. TRIBUNE, June 23, 1995 (attached as Ex. N).[12]

---

[11] This entry was observed by Plaintiffs in their limited review of the database.

[12] In addition, evidence suggests that Douglas would have been added to the database *prior* to the Glover homicide. In response to a question about which case put Douglas in the database, Sgt. Ridges testified that they "tried Johnny Douglas on another case where he was stabbed by one of his victims, I think, with a shard of glass. This was up by the Cabrini-Green area . . ." Ridges Dep. (Ex. I) at 109-10; the crime Sgt. Ridges described was likely ███████████████████████████████████████████ ██████████. *See* Ex. O, filed under seal.

Review of the full database will show the extent to which officers investigated cases and added information to the database after they were marked "closed." Such evidence will support Plaintiffs' claims that, in 1997 and 1998, as the task force gathered more evidence about Douglas' other crimes, the Defendant Officers could have connected Douglas to Glover.

**C.  The Full Database Will Show What Information the Defendant Officers Learned or Could Have Learned Had They Not Willfully Refused to Investigate.**

Access to the entire database will determine the probative value of a search for cases matching the *modus operandi* (M.O.) of Nina Glover's murder conducted in 1997 and 1998. As stated, the purpose of the MPTS was to draw connections between cases. *See* Ex. B at City 16175. If officers had searched the database for details matching Glover's murder (that she had been previously arrested for prostitution, that she was manually strangled, that she had ingested drugs, and that a vaginal test was positive for semen) that search would likely have pulled up several of Douglas' other cases, including the Marsh and Martin murders. But whether the Defendant Officers, having conducted such a search, would have made a connection between Douglas and Glover depends on whether that search would have returned 10 other cases in addition to Douglas' or 250 additional cases. If the former, a jury could find it more likely than not that had such a search been conducted, the officers would have hit on Douglas as a likely perpetrator.

**D.  The Full Database Will Show How Cases Were Labeled and Tracked.**

Production of the full database is necessary to also show in detail how cases were identified and how they were used to track patterns in the 1990s. For instance:

- The State's Attorney's Office has produced from its Martin homicide file ███████████ ████████████████████ ████████████████████████. *See* Ex. P, filed under seal. Analyzing the full database will ██████████████████████████████████████████

████████████████████████████████████, ███████████████████████████

██████████████████████ and how the database facilitated connections between cases

generally and for Douglas in particular.

- The full database will provide evidence as to what type of profile the CPD assigned the

Glover case. ████████████████████████████████████████

████████████████████████████████████ *See* Ex. B at

16179. Understanding the meaning of these categories and the categorization of the Glover

homicide requires comparing the Glover case with all other cases of that same category. Such

analysis may also show that the profile assigned the Glover case is inconsistent with the theory

of the crime to which Plaintiffs confessed (*i.e.*, a drug debt-motivated gang rape and murder),

especially given the fact that we now know Johnny Douglas committed the crime.

- The full database will ensure Plaintiffs receive all information about Douglas and the

crimes he committed (or may have committed). For instance, ████████████████████

████████████████████████████[13] ████████████████████████████

██████████████████████████████████████████

███████████ The "stripped down" database contains only those cases in which Douglas was

arrested; if there were other cases in which Douglas was suspected or otherwise mentioned in the

free-text "memo" or "notes" fields in the database, they will not be produced. It is also possible

that Douglas could be mentioned in the database using one of his many aliases or a misspelling

of his name. In-depth searches of the full database will ensure Plaintiffs receive all Douglas-

related information.

---

[13] *See* Ex. B at ████████████████████████████████████

**E.  The Full Database May Provide Evidence of Impeachment Against the Defendant Officers and Other CPD Witnesses.**

As detailed in Part B, some limited entries that Plaintiffs have already seen contradict representations made by Ridges. The full database may provide additional impeachment evidence against the Defendants or other CPD witnesses.

In sum, there is no question that the full database as it was kept in the ordinary course of business is relevant to Plaintiffs' claims.

**II.  Given the Database's Relevance, a Prohibition on its Production is Contrary to the Law and Restrictions Surrounding its Viewing are Unwarranted.**

Magistrate Judge Finnegan's rationale for denying production of the full database is contrary to federal discovery laws. As shown above, the information sought by Plaintiffs is clearly relevant to their claims. In addition, the discovery order does not justify the prohibition by reference to either the burden of production or privilege. The magistrate acknowledged in her order that producing the full database would not constitute a burden to the Defendants. *See* Ex. A at 14. And Magistrate Judge Finnegan did not analyze whether the investigative privilege would apply to the supposedly 39 open murder cases and 5 non-CPD[14] cases contained in the full database, *see id.* at 12, which are 20 years old.[15] In fact, the magistrate judge seemed to imply that the privilege would not apply given the age of the records at issue: "[W]e're in a little different situation [here] because this is an old database." *Id.* at 15; *see also id.* at 16 ("I don't know that I would be ordering this if we were talking about a – you know, a different database. But here it is an old database. I think with the information that's been – all the circumstances that

---

[14] There is no indication in the record that these non-CPD cases are open investigations. The City has previously stated it has no information about these cases. *See* Saunders Dkt. No. 273 at 7.

[15] "In determining whether the law enforcement privilege applies, courts have considered and weighed ten factors," including the burden on the government and the plaintiffs' right to obtain important information sought in good faith. *Santiago v. City of Chicago*, No. 09 C 3137, 2010 WL 1257780, at *2 (N.D. Ill. Mar. 26, 2010). Magistrate Judge Finnegan did not conduct this balancing test in ordering the discovery restrictions.

I have been presented with to date, there is justification to allow plaintiffs to at least view it[.]").[16]

Instead, the magistrate judge's denial of production stemmed mainly from concern over the *form* of the discovery at issue:

> Obviously, you know, parties would love to get the entirety of a law enforcement database and be able to run searches and see what connections they can make, what they might find that might support a Brady claim or some other claim. But in this day and age with technology advances, I believe more and more information, data, cases, case information is stored on databases. So whether it was asking for an FBI database, CPD, any other law enforcement database, it can't be that just because it is easy to produce a database, any lawyer that wants to start searching for connections to see what might be on there, has their own copy of a law enforcement database.

Ex. A at 15. Magistrate Judge Finnegan espoused apprehension about a possible "slippery slope," that ordering the production of this CPD database would necessitate the production of more general law enforcement databases in other civil rights suits.

This is not the case. As described above, the MPTS is a highly specific and limited database, containing only 293 cases and created to track a specific criminal pattern (prostitute murders) that is the *exact* pattern underlying the Glover murder investigation. It is not by any means a national database, a court system database, or even a broad crimes database (like the National Crime Information Center or Combined DNA Index System). Moreover, evidence already disclosed shows that this specific database was used to help officers connect the true perpetrator, Johnny Douglas, to two other strangulation-murders at the time of Plaintiffs'

---

[16] The Defendants have never justified with any particularity in prior pleadings the imposition of such a privilege. *See Doe v. Hudgins*, 175 F.R.D. 511, 514 (N.D. Ill. 1997) ("The party claiming the privilege … bears the burden of justifying application of the privilege. [That party] must explain with particularity the reasons that each document or class of documents is privileged."). An inadequate invocation of the privilege cannot be used to prohibit relevant discovery. *See Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-0660-DRH, 2015 WL 854506, at *4 (S.D. Ill. Feb. 26, 2015) (overturning magistrate judge's orders restricting depositions of relevant fact witnesses due to privilege) ("If a party is not allowed to pursue in discovery the facts that may support its theory because the assertion of a privilege is allowed to hide those facts from that party and the public, then the federal rules are rendered useless.").

prosecution, and the Nina Glover murder was *also* included in the database. For the reasons outlined above, Plaintiffs have specific reasons to believe this particular discovery contains evidence to support their legal claims and to bolster evidence already in the record. There is no risk that disclosure of the MPTS database will necessitate broad disclosure of any law enforcement database for "fishing expeditions" in other litigation.

There is also nothing special about an electronic database that would justify, by itself, a restriction on its production. Rule 34 specifically addresses the discovery of electronically stored information (ESI), and requires that such documents be produced "as they are kept in the usual course of business." FED. R. CIV. P. 34(b)(2)(E). In this vein, courts have regularly ordered the production of databases where, as here, the party seeking production has shown the information in the database—and the database itself—to be relevant to the litigation. *See, e.g.*, *Dekeyser v. Thyssenkrupp Waupaca, Inc.*, No. 08-C-0488, 2015 WL 10937559, at *3-7 (E.D. Wis. April 10, 2015) (ordering the production of defendant's electronic database of material safety data sheets (MSDSs), even though defendants had already produced the MSDSs themselves, because the database was relevant and plaintiffs "should be able to not only use the MSDSs but use and search the database with roughly the same easy and efficiency as can [defendant] and its employees); *Jones v. Nat'l Council of Young Men's Christian Ass'ns of the U.S.*, No. 09 C 6437, 2011 WL 3272868, at *2 (N.D. Ill. July 28, 2011) (ordering the production of defendants' "databases that included termination codes as they are kept in the normal course of business" because the database was relevant); *Covad Commc'ns Co. v. Revonet, Inc.*, 258 F.R.D. 5, 7 (D.D.C. 2009) (ordering the production and examination of defendant's database that housed all of its sales lead information because "the content of the Federated Database and the evidence within that database itself and elsewhere are the very heart of this lawsuit"); *Goshawk Dedicated*

*Ltd. V. Am. Viatical Servs., L.L.C.*, No. 1:05-CV-2343-RWS, 2007 WL 3492762, at *1 (N.D. Ga. Nov. 5, 2007) (ordering the production of defendant's database, all prior versions of the database, and all available backup copies, despite defendant's confidentiality concerns, because the information contained in the database was "highly relevant to the claims and defenses in this litigation"); *Omax Corp. v. Flow Int'l Corp.*, No. C04-2334L, 2007 WL 1830631, at *2 (W.D. Wash. June 22, 2007) (ordering the production of defendant's database, despite defendant's objections that the database was incomplete and potentially unhelpful, because the information in the database "does have some value and it is relevant to [plaintiff's] damages case").

Since Plaintiffs are entitled to the full production of the database, the conditions of review currently imposed are contrary to law. First, there is no legal justification for the limitation that only one attorney per plaintiff be allowed to "view" the database. Plaintiffs' attorneys work in teams, as do most lawyers conducting complex litigation. The team approach is necessary so that the attorneys can communicate about the evidence, and thereafter discuss legal strategy and make case decisions based on their findings. Allowing only one attorney per Plaintiff to view the database is unworkable as it prevents Plaintiffs' attorneys from effectively analyzing and making use of the information they see. Also, to the extent the attorney who views the database is allowed to freely share that information with other attorneys on the team, the restriction serves only to complicate the review and increase costs.

Second, the mandate that the database viewing occur in the Defendants' offices is unwarranted. The technological analysis required can only effectively be done in Plaintiffs' own offices, where they and their expert can review the database over the hours of time it is going to take to conduct a full-scale analysis of the 293 cases and their attendant data fields.[17]

---

[17] For example, determining the significance of the categories assigned to cases will require analyzing each case and comparing all cases within the same category. And ascertaining ███████████████

Third, the restrictions will hamper Plaintiffs from effectively analyzing the database's information and entering that information into evidence. The issue at stake is not only *what* specific data is in the database but also *how* the database facilitated connections between cases. Piecemeal review and production, like that ordered by the magistrate (Ex. A at 16), will not permit such analysis. The data expert who is reviewing the database must be able to testify that he looked at the *full* database in order to testify that a search of X in the database returns Y results, and to rebut any challenges by the Defendants that the review was not thorough or complete. Unless the full database is produced, Plaintiffs cannot put into evidence testimony about what kinds of searches could be performed and the results those searches would have generated. Nor can Plaintiffs effectively use the database at the deposition of Officer Danzl, the officer in the MPTS unit involved in linking Douglas to the Marsh and Martin murders, without being able to show him the database as it existed and in the form he would have used.[18]

In short, there is no valid basis for the conditions set forth in the discovery order. Defendants have not previously suggested there is anything in the database deserving special protection from discovery. In fact, most of the information in the database is exactly the type (rap sheets, arrest reports, and supplemental reports) normally produced in § 1983 suits. The only difference is precisely what makes production of the full database, without modification, essential: all of that information was linked in a stand-alone database in order to identify patterns and draw connections among cases. Restriction of its production will not only cause additional

---

████████████████████████████████████████████████████. It is simply not feasible to limit this analysis to only one attorney per Plaintiff and to require Plaintiffs and their expert to perform it on-site at Defendants' offices.

[18] Plaintiffs noticed Danzl's deposition in January 2015. Plaintiffs are awaiting final production of the database in order to question Danzl about the database and how exactly it facilitated his investigation of Douglas and connection of Douglas to the other murder cases.

delay and incur further costs but also deprive Plaintiffs of the ability to develop evidence relevant to their legal claims.

### III.     Any Concerns About the Production of a Law Enforcement Database Can Be Addressed by Producing the Database Pursuant to a Protective Order.

A protective order covering the database and analyses based on searches of the database is sufficient to address any investigative or confidentiality concerns (*e.g.*, social security numbers listed in the database) that may be put forth by the City. Indeed, protective orders have been deemed sufficient even in cases where, unlike here, the discovery sought concerned *open and active* investigations. *See Santiago*, 2010 WL 1257780, at *3. In this case, the database is operated using a very old program ("Paradox"), which is no longer widely used. Plaintiffs' expert had to search out a copy of the program before he could even open the database. *See* Saunders Dkt. No. 280-1. Further, as they noted in court, *see* Ex. A at 23-24, Plaintiffs' attorneys are officers of the court and will obey any protective orders issued in discovery.

### CONCLUSION

WHEREFORE Plaintiffs respectfully request that this Court enter an order overruling Magistrate Judge Finnegan's opinion and compelling Defendant City of Chicago to produce the entirety of the MPTS database to Plaintiffs' counsel.

Dated: August 8, 2016

Respectfully submitted,

/s/ Alexandra Lampert
Peter Neufeld
Nick Brustin
Anna Benvenutti Hoffmann
Alexandra Lampert
Danielle Hamilton
Neufeld Scheck & Brustin LLP
99 Hudson St., 8th Floor
New York, NY 10013
212.965.9081

John Benson
Law Office of John C. Benson
4111 S. Richmond
Chicago, IL 60632
312. 399.5419
**Counsel for Michael Saunders**;
Case No. 12-12-9158

/s/ Russell Ainsworth
Arthur Loevy
Jon Loevy
Russell Ainsworth
David Owens
Loevy & Loevy
312 N. May St., Ste. 100
Chicago, IL 60607
312.243.5900
**Counsel for Harold Richardson**;
Case No. 12-9184

/s/ Henry Turner, Jr.
Stuart Chanen
Henry Turner
Valorem Law Group
35 East Wacker Dr., Ste. 3000
Chicago, IL  60601
Phone: (312) 676-5460
**Counsel for Vincent Thames**;
Case No. 12-9170

**<u>CERTIFICATE OF SERVICE</u>**

I, Alexandra Lampert, an attorney, certify that on August 8, 2016, I caused a copy of *Plaintiffs Michael Saunders, Vincent Thames, and Harold Richardson's Objections To Magistrate Judge Finnegan's July 25, 2016 Order On Plaintiffs' Motion To Compel The "MPTS" Database* to be filed in both a sealed and redacted form under Local Rule 26.2 using the Court's electronic filing system (ECF) and that each counsel of record was served through the Court's electronic filing system.

<u>/s/ Alexandra Lampert</u>
Alexandra Lampert
Neufeld Scheck & Brustin LLP
99 Hudson St., 8th Floor
New York, NY 10013
212.965.9081