# EXHIBIT NO. 1
# FILED UNDER SEAL PURSUANT TO LOCAL RULE 26.2

FD-302 (Rev 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription  03/14/2012

TERENCE JOHNSON, date of birth 08/17/1965, was interviewed at his residence, 17205 Springtide, Hazel Crest, IL, telephone 708-335-6000. Present during the interview were Department of Justice Trial Attorneys Mark Blumberg and Betsy Biffl. After being advised of the identities of those present and the nature of the interview, JOHNSON provided the following information:

JOHNSON worked for the Cook County States Attorneys Office (SAO) as an Assistant States Attorney (ASA) from 1990 until 2000. In 1995, JOHNSON was assigned to Felony Review Unit (FRU) of the SAO. JOHNSON worked in the FRU for approximately 18 months, which he felt was a longer than the average tenure in the unit for ASAs.

In JOHNSON's opinion, the assignment to the FRU had the potential to "make or break" the careers of the ASAs. The ASAs were all trying to get to the Trial Division of the SAO, and their performance in the FRU was a stepping stone to the Trial Division. The ASAs in the FRU were encouraged by the SAO to cooperate with detectives during investigations, and if the ASAs did not cooperate the detectives would call the SAO to tell the ASAs' supervisor they were not team players.

In 1995, the FRU was supervised by CHUCK BURNS. During meetings with ASAs in the unit, BURNS always expressed concerns about the ASAs that were not considered team players and he praised the ASAs that got along with the detectives.

JOHNSON and ASA SUSAN Last Name Unknown (LNU) were the only two black ASAs assigned to the FRU at the time. BURNS told JOHNSON that because he was black he needed to be "over and above" to show the detectives he was a team player, because the detectives would assume JOHNSON was not a team player when he arrived at the police station. The subjects in the police districts covered by Chicago Police Department (CPD) Area 1 and Area 2 stations were typically black, and detectives were leery of JOHNSON because they felt he would go easy on the subjects because JOHNSON was also black. BURNS told JOHNSON he had three things working against him, he was black, he was young and the detectives would think he would require them to work extra hard to prosecute another black man.

---

Investigation on  03/13/2012  at  Hazel Crest, IL

File #  282A-CG-130585-302                    Date dictated  _____

by  SA Jeffrey B. Moore

This document contains neither recommendations nor conclusions of the FBI It is the property of the FBI and is loaned to your agency, it and its contents are not to be distributed outside your agency

SUBJECT TO PRIVACY ACT PROTECTIVE ORDER

FBI000199

FD-302a (Rev 10-6-95)

282A-CG-130585-302

Continuation of FD-302 of __TERENCE JOHNSON__ , On __03/13/2012__ , Page __2__

When JOHNSON reviewed cases for CPD, if he did not approve charges right way the detectives became frustrated and would suggest that he just approve the charges because they had other cases to work on. The detectives often told JOHNSON to tell the victims family if the charges were not approved and that he should be working for the defense. Sometimes when dealing with black subjects the detectives would make comments with racial overtones, such as "I need you to talk to them because I can't understand what he is saying" or "you should know what he is talking about."

On "heater cases", which were cases that made the press, BURNS stressed that JOHNSON and the other ASAs work with the detectives to get the charges approved. The detectives always made a call to BURNS if JOHNSON did not approve charges or wanted the investigation to continue. The first thing BURNS would ask JOHNSON is, "What's wrong with the case." BURNS would follow up by saying the detectives explained the case to him and that JOHNSON should move the case along. BURNS always wanted to give the detectives whatever they wanted.

If ASAs ever challenged BURNS on his decisions, BURNS made their lives miserable. If an ASA did not go along with the detectives and was perceived as not being team player, it was common for BURNS to give the ASA a research assignment as punishment.

ASAs in the FRU were assigned to one of the CPD Area headquarters. JOHNSON was assigned and physically located at Area 1, located at 51st and Wentworth. The NINA GLOVER homicide investigation was worked by CPD Area 1 detectives, and JOHNSON was the first FRU ASA assigned to work the case. Due to the number of subjects involved with the case JOHNSON called ASA FABIO VALENTINI for additional support.

JOHNSON always felt the GLOVER homicide investigation did not make sense and was "going to come back." JOHNSON recalled that Detective CASSIDY was the principal detective on the case, and JOHNSON always felt the eagerness of CASSIDY and the other detectives to solve a case involving a victim such as GLOVER was unusual. In JOHNSON's experience a victim such as GLOVER, a prostitute/drug user, never brought that kind of enthusiasm from the detectives. JOHNSON also felt the explanation that several gang members killed a woman because she owed one of them money did not make sense. The detectives were also eager to get everyone on

SUBJECT TO PRIVACY ACT PROTECTIVE ORDER

FBI000200

FD-302a (Rev 10-6-95)

282A-CG-130585-302

Continuation of FD-302 of __TERENCE JOHNSON__ , On _03/13/2012_ , Page _3_

the same page regarding the details of the case. JOHNSON recalled that one of the subjects who was supposedly the look out when the crime occurred did not have a criminal record, and JOHNSON thought that for that subject or any of the other subjects to turn on everyone else did not make sense to JOHNSON. JOHNSON is not sure why the four subjects were chosen other than for their gang affiliation.

In general, when JOHNSON was called by detectives to meet with subjects in a case the subjects were already ready to talk and had been prepped by the detectives regarding what they were going to say. When JOHNSON first met with detectives on the GLOVER case, he was told they had a key person in custody that was a great witness and needed to be locked in. JOHNSON recalled the person had no criminal background and was an honor roll student. JOHNSON recalled that the detectives told the subject that the first person to talk is the person that they will recommend as a witness. The detectives told the subject that he would be more believable if he talks about his own involvement and the more honest he is the more likely he will be a witness, and witnesses go home.

JOHNSON never heard any of the detectives tell one of the subjects, "Say what we want you to say and you can go home", but at some point during all the interviews the subjects were told that the first one to talk can become a witness and that witnesses go home. The strategy was to use the subjects against each other. They were told the detectives needed a witness, and if they were forthcoming and credible they would be the witness. JOHNSON heard CASSIDY make the "witnesses go home" statement, and there were generally two or three other detectives in the room when the statement was made.

JOHNSON felt the detectives coached and fed the subjects information during the court reported and handwritten statements. At some point during all the statements the subject would say something that didn't match up and the detective would respond, "That's not what you said earlier" or "That's not what you told me." The detective would then state what the subject said before and the subject would agree.

Out of all the statements in the GLOVER case the court reported statement bothered JOHNSON the most. Detective VALADEZ witnessed the court reported statement but Detective BOUDREAU prepped the subject for the statement before the court reporter arrived. Before the court reporter arrived, they spent more time

SUBJECT TO PRIVACY ACT PROTECTIVE ORDER

FBI000201

FD-302a (Rev. 10-6-95)

282A-CG-130585-302

Continuation of FD-302 of __TERENCE JOHNSON__ , On _03/13/2012_ , Page __4__

    with the subject preparing him for the statement than they did with any of the other subjects. JOHNSON typically would let the subject know what questions he was going to ask, but in this case BOUDREAU wanted to rehearse the responses from the subject. As JOHNSON went through the questions with the subject, BOUDREAU often corrected the subject's responses. JOHNSON did not realize until he got all of the statements together that the corrections BOUDREAU made to the subject's responses made the facts more consistent with the other statements.

    VALENTINI had the same perception that the subjects were coached by the detectives and fed information. VALENTINI had misgivings about the case and he also felt it would come back around. JOHNSON recalled during a conversation VALENTINI stated, "I can't believe these detectives." VALENTINI told JOHNSON that two of the subjects he took statements from refused to sign the handwritten statement after the statements were completed and reviewed. In one of the cases VALENTINI told JOHNSON the subject got cold feet and recanted the statement. VALENTINI told JOHNSON he reenforced the detectives promise about becoming a witness and the subject eventually signed the statement.

    In the other case VALENTINI told JOHNSON the subject's parents were in the room with them, and the subject got cold feet and recanted the statement after reading the statement. As before, VALENTINI reenforced the statement about becoming a witness, but the subject still refused to sign. In a conversation JOHNSON had with VALENTINI in the presence of the detectives, VALENTINI told JOHNSON that he felt the subject recanted because he did not want his parents to know what he had done.

    None of the subjects in the GLOVER case appeared to have been beaten, but JOHNSON worried the statements were fabricated because they were too consistent and the cops fed the subjects information during the statements. There were only a couple of times in JOHNSON's career when he felt subjects may have been physically abused. In those cases the detectives would always give an excuse for the subject's injuries, such as the subject resisted while been arrested. When JOHNSON noticed physical injuries, he would ask to spend time alone with the subject and take his own photographs of the subject, which prompted the detectives to call BURNS to complain. JOHNSON never witnessed anyone being physically abused, he felt that because he was black he was not brought into that inner circle.

SUBJECT TO PRIVACY ACT PROTECTIVE ORDER

FBI000202

FD-302a (Rev 10-6-95)

282A-CG-130585-302

Continuation of FD-302 of __TERENCE JOHNSON__ , On __03/13/2012__ , Page __5__

    In the GLOVER case JOHNSON did not spend time alone with any of the subjects. JOHNSON was trained to ask if everything was ok, and if the subjects were allowed to eat and use the restroom after the statements were taken.

    During the motion to suppress hearing CASSIDY and Detective PALIDINO circulated a document that detailed what the detectives and ASAs should say when questioned regarding the circumstances of the GLOVER investigation. CASSIDY passed the document to JOHNSON and VALENTINI and told them to read it before they testified. CASSIDY told them, "this is what we do" and that the document would help if they are asked certain questions. The document was used so that they all would provide a consistent statement. During breaks the detectives told JOHNSON and VALENTINI what the defense attorneys were asking and focusing on and what their responses should be. The detectives told them to follow the time line so they would be on the same page. They were concerned the judge would throw out the statements.

    It bothered JOHNSON that they were all supposed to agree to the way things happened. JOHNSON and VALENTINI discussed the situation in the hall outside the courtroom. JOHNSON decided not to testify to the document and they debated whether they should tell someone about it. VALENTINI expressed concern that it would be career ending if they reported the incident. VALENTINI was concerned that JOHNSON would not hold up and he suggested that they go along with the detectives and back each other up so that the case would be less likely to come back. VALENTINI told JOHNSON he would use the time line and that it would help them remember. JOHNSON told VALENTINI he would say he didn't remember if there was something in the time line he did not agree with. JOHNSON did not read, memorize or testify from the document. JOHNSON never told anyone about the incident or document.

    After JOHNSON's testimony, CASSIDY asked him what he testified to, JOHNSON responded that he said what happened to the best of his memory. JOHNSON felt the motion to suppress hearing was "Rigged", but he still felt pressure not to report the incident when he was out of the FRU. In the Trial Division ASAs still needed cops and the word got around if they were not team players. JOHNSON felt added pressure because he was one of a few black prosecutors.

SUBJECT TO PRIVACY ACT PROTECTIVE ORDER

FBI000203

FD-302a (Rev 10-6-95)

282A-CG-130585-302

Continuation of FD-302 of __TERENCE JOHNSON__ , On _03/13/2012_ , Page _6_

     When Detectives called the FRU they routinely asked for the ASA they wanted to be assigned to the case. Prior to the GLOVER case, JOHNSON had a problem pushing cases through, so JOHNSON speculated that he was chosen for the GLOVER case because they felt he would be eager to get back on good terms with the detectives. JOHNSON received many commendations for the case and the detectives complimented JOHNSON on a good job.

     JOHNSON was shown a copy of the top cover of his felony review folder from the GLOVER case. JOHNSON confirmed that he wrote the note on the folder that documented RICHARDSON's oral statement.

     JOHNSON last talked about the case with VALENTINI about fifteen years ago. When JOHNSON left the SAO in 2000, VALENTINI was a first chair and JOHNSON was a second chair in the Trial Division.

     A few weeks ago MARK ERTLER from the SAO came out to ask JOHNSON about the GLOVER case. ERTLER wanted to know if JOHNSON felt the case should be retried. JOHNSON told ERTLER the case should not be retried and he told ERTLER hypothetically about the cheat sheet/time line that was passed out by the detectives prior to the motion to suppress hearing.

     JOHNSON provided his copy of the time line that CASSIDY gave him during the motion to suppress hearing. The time line was placed into the 1A section of the substantive file.

SUBJECT TO PRIVACY ACT PROTECTIVE ORDER

FBI000204